**William J. CAROTHERS, et al.**

v.

**Jackie PRESSER, et al., Appellants.**

**No. 86–5476.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 6, 1987.

Decided May 12, 1987.

Gary S. Witlen, with whom Joseph E. Santucci, Washington, D.C., and Paul S. Lefkowitz, Cleveland, Ohio, were on the brief, for appellants.

Paul Alan Levy, with whom Alan B. Morrison and Arthur L. Fox II, Washington, D.C., were on the brief, for appellees.

---

Before WALD, Chief Judge, and EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case, we are called upon to decide whether section 101(a) of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA" or "Act"), 29 U.S.C. § 411(a) (1982), affords union members a "right of access" to their union's mailing list for the purpose of disseminating their views on a contract proposal submitted to the membership for ratification.[1] The plaintiffs-appellees are three members of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters" or "Union") who belong to dissident groups within the Teamsters known as Teamsters for a Democratic Union ("TDU") and the Carhaul Coordinating Committee ("CCC").[2] Anxious to express their opposition to a proposed collective bargaining agreement negotiated by the Union leadership, the appellees asked the Union to provide them with "access"[3] to the addresses of all Union members covered by the proposed agreement. The Union refused, prompting the present litigation.

In their initial complaint against the Union and its General President, Jackie Presser, the appellees sought a temporary restraining order suspending a vote on the proposed contract until such time as the Union provided access to its mailing list. The District Court, per Judge Oberdorfer, denied the temporary restraining order. *See Carothers v. Presser,* No. 85–2645, slip op. (D.D.C. Aug. 21, 1985), *reprinted in* Record Excerpts ("R.E.") 31–33. The voting proceeded and the contract was ratified by the Union membership.

The appellees subsequently filed an amended complaint seeking two forms of permanent relief. First, they sought a declaration that the appellants had violated section 101(a) of the LMRDA by denying their request for access to the Union mailing list.[4] Second, they sought an injunction requiring the appellants, in the future, to provide access to the list to any Union member interested in disseminating his views on a contract submitted to the membership for ratification.

Concluding that a "right of access" to a union's mailing list "may be found" under section 101(a), the District Court, per Judge Gasch, granted both forms of relief requested by the appellees. *See Carothers v. Presser,* 636 F.Supp. 817, 827–28 (D.D.C.

1. Section 101(a) is part of Title I of the LMRDA. The provisions of Title I are collectively referred to as the "Bill of Rights of Members of Labor Organizations." *See* 29 U.S.C. §§ 411–415 (1982).

2. The Carhaul Coordinating Committee is a subset of the TDU.

3. The appellees did not request personal use of the Union's mailing list. Rather, they proposed that their literature be sent to the membership through an independent mailing service. The appellees would bear the full cost of the mailing.

4. The appellees claimed that the denial of access violated *both* subsections 101(a)(1) and 101(a)(2). Those two subsections provide in full:

(a)(1) **Equal rights**
Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor orga-

nization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.
(2) **Freedom of speech and assembly**
Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.
29 U.S.C. § 411(a)(1)–(2) (1982).

1986). First, the court declared that the appellants had violated subsections 101(a)(1) and 101(a)(2) by denying the appellees' request for access to the mailing list. Second, the court enjoined the appellants to permit access to the list in the future to any Union member interested in expressing his opposition to a contract proposal submitted to the national membership for ratification.

We conclude that the District Court erred in finding that the denial of access to a union's mailing list, standing alone, is a "violation" of the LMRDA, or, in other words, that the LMRDA affords union members an absolute "right of access" to their union's mailing list. We find that access to a union's mailing list may only be granted in appropriate circumstances as a *remedy* for an independent violation of the statute. In the instant case, the District Court failed to identify with particularity an independent violation of the statute that would entitle the appellees to any relief under the LMRDA, much less to a sweeping injunction that requires the appellants to make the addresses of Union members accessible to any dissident member who asserts an interest in commenting on a proposed contract. Accordingly, we reverse the judgment of the District Court.

## I. BACKGROUND

The appellees are three members of the Teamsters who belong to two dissident groups within their Union—the TDU and the CCC. The appellees' principal work—referred to as "carhauling"—involves transporting automobiles and other vehicles by truck to various locations across the country. As "carhaulers," the appellees' terms of employment are governed by the National Automobile Transporters Agreement ("NATA").

The NATA is a multi-employer collective bargaining agreement that governs relations between 100 Teamsters locals and 39 employers. It consists of a master agree-

ment setting certain wages and working conditions on a nationwide basis, and a series of supplemental agreements establishing certain terms of employment by region and job classification. The contract is normally negotiated at three-year intervals by the Teamsters' negotiating committee, which, in accordance with the Union constitution, submits negotiated agreements to the entire national membership for ratification. Under the Union's interpretation of its constitution—upheld against legal challenge in *Davey v. Fitzsimmons*, 413 F.Supp. 670 (D.D.C.1976)—the master agreement and all supplementals are voted on by the entire membership as a single package. The Union's usual practice, however, is to send each member a ballot packet containing only the master agreement and the one supplemental agreement governing that member's region and job classification.

The events giving rise to this litigation began in June of 1985 when a proposed contract was submitted to the membership for ratification. The TDU and the CCC disseminated a significant amount of literature urging Union members to vote against ratification. The Union, on the other hand, included a notice in its ballot packet urging members to vote in favor of the contract. The contract proposal was defeated by a vote of approximately four to one.

A strike ensued, and the Union returned to the bargaining table in an attempt to reach an acceptable agreement. Before negotiations on a new agreement had been completed, the appellees requested "access" to the Union's mailing list for the purpose of communicating their expected opposition to the forthcoming agreement.[5] The appellees proposed to distribute their literature in much the same way as the Union distributes its materials to the membership—through an independent mailing service [6]—and they agreed to assume the full cost of the mailing.

5. As the District Court found, the appellees have opposed every carhauler contract negotiated by the Union since 1979. *Carothers v. Presser*, 636 F.Supp. 817, 822 (D.D.C.1986).

6. In the alternative, the appellees proposed that the Union include their literature in the ballot packets mailed to the membership.

The Union rejected the appellees' request, asserting that it was not legally obligated to provide access to the list because it did not intend to include a letter in its second ballot packet urging ratification of the agreement. Because the Union had by this time negotiated a new agreement and prepared a second ballot packet, the appellees filed suit in District Court seeking a temporary restraining order prohibiting the Union from conducting the vote until access to the mailing list was provided. Judge Oberdorfer, sitting as motions judge, refused to issue a restraining order, citing the apparent availability of alternative means of communication and the need to avoid disruption of collective bargaining in an important national industry. *See Carothers v. Presser*, No. 85–2645, slip op. (D.D.C. Aug. 21, 1985), *reprinted in* R.E. 31–33. The voting proceeded and the contract was ratified by a vote of 8,792 to 6,808.

The appellees subsequently amended their complaint to request a declaration that the Union had violated section 101(a) of the LMRDA by denying their request for access, and an injunction compelling the Union to provide such access in future ratification votes. On cross-motions for summary judgment, Judge Gasch ruled in favor of the appellees and issued an order granting both declaratory and injunctive relief. *See Carothers v. Presser*, 636 F.Supp. 817 (D.D.C.1986).[7] This appeal followed.

## II. ANALYSIS

A. *There is no Independent "Right of Access" to a Union's Mailing List Under the LMRDA*

We begin our analysis with a proposition that we regard as self-evident from the unambiguous statutory language; namely, that section 101(a) of the LMRDA does not grant union members an absolute "right of access" to their union's mailing list. As

the District Court recognized, the " 'overriding objective' " of the LMRDA is to ensure that unions will be " 'democratically governed'." 636 F.Supp. at 822 (quoting *Finnegan v. Leu*, 456 U.S. 431, 441, 102 S.Ct. 1867, 1873, 72 L.Ed.2d 239 (1982)). However, in enacting the LMRDA, Congress did not leave courts without guidance in defining this concept of "democracy" in the union setting, for the statute sets forth certain *specific regulations* governing internal union affairs. In other words, "democracy" under the LMRDA is not merely a boundless ideal to be defined by the whim of any dissident voice; rather, the statutory notion of internal union democracy is precisely limited by the scope of the protections codified by Congress in the LMRDA.

When unions violate the specific statutory proscriptions established by Congress, section 102 of the Act, 29 U.S.C. § 412 (1982), grants district courts broad discretion to fashion appropriate relief. *See Hall v. Cole*, 412 U.S. 1, 10–11, 93 S.Ct. 1943, 1948–1949, 36 L.Ed.2d 702 (1973). However, before granting relief, courts must first identify the specific statutory right that has been infringed. *See* 29 U.S.C. § 412 (1982) ("Any person whose rights secured by the provisions of this subchapter have been infringed ... may bring a civil action ... for such relief ... as may be appropriate."); *Mallick v. International Bhd. of Elec. Workers*, 749 F.2d 771, 786 (D.C.Cir.1984) (plaintiff seeking relief under 29 U.S.C. § 412 must ground his claims on a violation of a specific right enumerated in the statute). The obstacle facing the appellees in the instant case is that the LMRDA contains no statutory language supporting the bold suggestion that Congress intended to grant union members an absolute "right of access" to their union's mailing list.

In their arguments before the District Court, and again on appeal, the appellees

---

7. Judge Gasch concluded that the case was not moot because the dispute between the parties was "capable of repetition, yet evading review." 636 F.Supp. at 821–22. We agree that this exception to the mootness doctrine, which is frequently applied in the voting context, renders this case justiciable. *Cf., e.g., Democratic Party*

*of United States v. Wisconsin ex rel. La Follette,* 450 U.S. 107, 115 n. 13, 101 S.Ct. 1010, 1015 n. 13, 67 L.Ed.2d 82 (1981); *Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974). The appellants do not contend otherwise on appeal.

have attempted to ground their asserted "right of access" on two separate subsections of section 101. First, they maintain that a right of access may be derived from subsection 101(a)(1), which provides, in pertinent part, that "[e]very member of a labor organization shall have equal rights and privileges within such organization ... to vote in elections or referendums of the labor organization."[8] Second, they assert that a right of access necessarily flows from subsection 101(a)(2), which provides, in relevant part, that "[e]very member of any labor organization shall have the right ... to express any views, arguments, or opinions."[9]

Although the precise scope of these two statutory provisions is anything but settled, we categorically reject the suggestion that either provision creates an independent "right of access" to a union's mailing list in favor of any union member who asserts an interest in commenting on a proposed contract. Phrased somewhat differently, a union does not violate section 101 when, *without more*, it rejects a union member's request for access to its mailing list. To hold otherwise would be to read a right into the statute without one iota of evidence that Congress intended to create one.

Where Congress intended to create a right of access to a union's mailing list *independent of some underlying statutory violation*, it said so explicitly. This is seen in section 401(c) of the statute, 29 U.S.C. § 481(c) (1982), where Congress expressly provided for access—enforceable in federal district court—in favor of any bona fide candidate for election to union office.[10] However, there is nothing in the statute to indicate that Congress embraced the broad proposition urged upon us by the appellees and accepted by the District Court—that any union member must be granted access to his union's mailing list whenever he asserts an interest in commenting on a contract submitted to the national membership for ratification. Had Congress meant to achieve this result, it obviously knew how to do so.

Nor is there any support in the case law for the position advanced by the appellees. The case on which they rely most heavily, *Sheldon v. O'Callaghan*, 497 F.2d 1276 (2d Cir.), *cert. denied*, 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974), did not go so far as to suggest that a union's refusal to grant access to its mailing list, standing alone, constituted a violation of section 101(a). In *Sheldon*, the union used its mailing list to urge members to vote in favor of a proposed constitution, and repeatedly published materials in the union

---

**8.** *See* note 4 *supra.*

**9.** *See id.*

**10.** Section 401(c) provides in full:
(c) **Requests for distribution of campaign literature; civil action for enforcement; jurisdiction; inspection of membership lists; adequate safeguards to insure their fair election**
Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organiza-

tions or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution. Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observor at the polls and at the counting of the ballots.

newspaper advocating its proposal, while denying a similar opportunity to union dissidents. *Id.* at 1279–80. It was also alleged that the information published by the union was misleading. *Id.* at 1281. In considering the unique circumstances presented, the court in *Sheldon* concluded that the union's denial of access rendered the referendum vote "so patently unfair" as to amount to a denial of the members' "equal right to vote." *Id.* at 1282–83 & n. 9. It is clear from this language that the court in *Sheldon* viewed access to the union's mailing list not as an independent right contained in the statute, but as a remedy for a separate statutory violation— the denial of the plaintiffs' "equal right to vote."

### B. *The District Court Erred by Ordering Access Without Making a Particularized Finding of a Statutory Violation*

*Sheldon* illustrates the proper role of a court in litigation under Title I of the LMRDA. First and foremost, the court must determine whether the union's conduct deprived the plaintiffs of a right *specifically enumerated* in the statute, such as the right to an equal vote, found in subsection 101(a)(1), or the right to "express any views, arguments, or opinions," found in subsection 101(a)(2). Once it has made a *particularized finding* that the union violated a right specifically enumerated in the statute, the court may fashion a remedy tailored to the violation. Under appropriate circumstances, that remedy may include an order that the union provide the injured parties with "access" to its mailing list.

In the instant case, the District Court made no particularized finding that the appellants violated a right specifically enumerated in the LMRDA. Rather, the trial court's opinion erroneously embraces the view that the *Act itself* guarantees the appellees a "right of access" to their Union's mailing list, and that the appellants' refusal to permit such access therefore con-

stituted an independent violation of the statute. *See* 636 F.Supp. at 827–28. This erroneous view prompted the court to issue a sweeping injunction requiring the Union—*in all future ratification votes*—to provide access to its mailing list to any dissident member who requests such access for the declared purpose of expressing his views on a proposed contract. We cannot uphold such broad relief where it is totally divorced from the essential predicate of a statutory violation.

To be sure, the District Court did not purport to create a "right of access" to a union's mailing list out of thin air. Rather, it opined that such a right could be "found" under two specific provisions of the statute—subsection 101(a)(1), which guarantees union members the right to an equal vote, and subsection 101(a)(2), which assures union members the right to "express any views, arguments, or opinions." The essential flaw in the court's analysis, however, is that it failed to explain with the required specificity how the Union's conduct *in this case* deprived the appellees of their right to an equal vote or their right to express their views, arguments, or opinions.

In discussing subsection 101(a)(1), the District Court focused its analysis on the appellants' assertion that a union member's right to an "equal" vote could be abridged only where the union used its mailing list to disseminate its views on a proposed contract while denying union dissidents "equal" access to the list.[11] *Cf. Lodge 1380, Bhd. of Ry., Airline & S.S. Clerks v. Dennis,* 625 F.2d 819, 826 (9th Cir.1980) (contention that union deprived members of their right to an equal vote by denying their request for access to union mailing list fails to state claim for relief under subsection 101(a)(1) absent allegation that union made use of list in a discriminatory fashion). The court rejected this asserted limitation on subsection 101(a)(1), finding that this circuit and others had construed the right to an "equal" vote broadly to encompass the right to a "meaningful"

---

**11.** It is undisputed in this case that the Union did not utilize its mailing list to distribute literature in support of the proposed contract. This is one factor that distinguishes the instant case from *Sheldon.*

vote. *See* 636 F.Supp. at 823–24 and cases cited therein. Having construed subsection 101(a)(1) in this manner, however, the trial court failed to consider whether the evidence in the record supported a finding that the Union's denial of access had somehow deprived the appellees of a "meaningful" vote. In the absence of a finding of a statutory violation, the court was obviously without authority to fashion a "remedy."

Similarly, the trial court's discussion of subsection 101(a)(2) focused on the appellants' contention that a union member's right to express any "views, arguments, or opinions" could be abridged only where the union took "direct reprisals" against the member for discussing union affairs.[12] The court rejected this contention, finding that subsection 101(a)(2) protected the right of union members to "communicate effectively" with other members regarding a vote put to the national membership. 636 F.Supp. at 827; *cf. Dennis,* 625 F.2d at 826–28 (union members need not allege direct reprisals to state a claim that denial of access to mailing list infringed their subsection 101(a)(2) rights); *see also Mallick v. International Bhd. of Elec. Workers,* 749 F.2d 771, 786 (D.C.Cir.1984) (intimating no view on *Dennis,* but concluding that what-

ever the precise scope of subsection 101(a)(2), it "does not guarantee access to all information a member might want to speak about").[13] Again, however, the trial court failed to make a particularized finding that the Union's denial of access under the circumstances of this case deprived the appellees of an opportunity to "communicate effectively" with the Union membership. Indeed, the court failed even to acknowledge uncontested evidence in the record suggesting that the appellees had alternative means by which to communicate their views.[14]

The trial court did suggest that the voting procedures utilized by the Union in this case supported the appellees' request for access to the Union's mailing list. In particular, the court was troubled by the fact that the Union constitution required each member to vote on the entire contract as a single package, *i.e.,* to vote on the master agreement together with *all* supplemental agreements affecting members in locals throughout the country. This requirement, the court found, made it essential for members of distant locals to be able to communicate with one another about their particular supplemental agreements. 636 F.Supp.

---

**12.** This contention was based on *United Steelworkers v. Sadlowski,* 457 U.S. 102, 111, 102 S.Ct. 2339, 2345, 72 L.Ed.2d 707 (1982), where the Supreme Court wrote, in dictum, that subsection 101(a)(2) was "intended ... to restate a principal First Amendment value—the right to speak one's mind without fear of reprisal." There is no allegation in the instant case that the appellees suffered reprisals for expressing their views concerning the proposed contract.

**13.** As in *Mallick,* it is unnecessary in this case to define the exact parameters of subsection 101(a)(2). *See* notes 14 & 18 *infra.* We do note, however, that the District Court was plainly correct in finding that subsection 101(a)(2) protects union members against more than just "direct reprisals."

The appellants' reliance on the dictum in *Sadlowski, see* note 12 *supra,* as placing a strict limitation on the scope of subsection 101(a)(2) is badly misplaced. *Sadlowski* involved a union rule that prohibited candidates for union office from accepting campaign contributions from nonmembers. Despite the absence of any allegation that the union rule was "retaliatory" in nature, the Court found that the rule implicated free speech interests protected by subsection

101(a)(2). Specifically, the Court found that the rule tended to affect a candidate's ability to "foster[ ] vigorous debate," "criticize union policies," and "mount effective challenges to union leadership." 457 U.S. at 112–13, 102 S.Ct. at 2346. The Court also noted that the rule tended to affect the number of issues discussed, the attention devoted to each issue and the size of the audience reached. *Id.* Although the Court ultimately held that the scope of subsection 101(a)(2) was *not* coextensive with the scope of the First Amendment, it clearly viewed that subsection as more than a guarantee of freedom from "direct reprisals."

**14.** See, for example, the documents and exhibits listed at R.E. 5–7. By alluding to this uncontroverted evidence, we do not purport to assume the role of factfinder and to conclude that the appellees *did in fact* have access to alternative means of communication. Nor, as explained in note 18 *infra,* do we intimate any view on the legal significance that attaches to either the existence or absence of alternative means of communication. We simply hold that the District Court failed to make an adequate finding of a statutory violation even under its own interpretation of the statute.

at 827. The court also intimated that the potential communication problems created by the Union's voting procedures were exacerbated by the fact that the Union did not mail the complete contract package to each voting member, but only the *single* supplemental agreement applicable to that member's region and job classification. *Id.* at 820.

Once again, however, the court failed to make a particularized finding that the appellants, under the totality of the circumstances, had violated a right specifically enumerated in the statute. Equally as important, the court did not condition its "relief" on the existence of the circumstances it regarded as troubling; rather, it issued a broad injunction requiring the Union to provide access to its mailing list whenever it conducts a referendum vote on a proposed collective bargaining agreement, without regard to the circumstances of the particular vote. *See id.* at 828. In short, the court created an absolute right of access to a mailing list under section 101(a) in favor of any dissident Union member who expresses an interest in commenting on a contract submitted to the membership for ratification.

At oral argument, both sides agreed that the litigation in the District Court had focused squarely on whether section 101(a) guarantees a "right of access" to a mailing list whenever a union holds a nationwide vote on a contract proposal, *not* on whether the particular voting arrangements utilized by the Union in this case—coupled with the denial of access to its mailing list—amounted to an independent violation of the statute. Indeed, when pressed at oral argument, counsel for the appellees frankly conceded that the "relief" sought (and obtained) from the District Court was not dependent on the particular voting procedures followed by the Union.[15] It is apparent that throughout this litigation, the appellees have sought a ruling that section 101(a) entitles any union member who asserts an interest in disseminating his or her views in connection with a nationwide ratification vote to obtain access to the union's mailing list. For the reasons already articulated, and for the additional reasons outlined below, we categorically reject the position advanced by the appellees.[16]

## C. The Statutory Purpose of Furthering Union "Democracy" Does Not Give Rise to a "Right of Access"

In embracing the broad proposition urged by the appellees, the District Court was animated by its view that the purposes underlying the enactment of Title I of the LMRDA would best be served by a broad construction of section 101(a). Specifically, the court noted that Congress' " 'over-

---

**15.** Counsel for the appellants represented at oral argument that had the litigation in the District Court focused on the adequacy of the Union's voting procedures, the Union would have agreed to abandon its policy of sending Union members only the master agreement and the single supplemental agreement governing their region and job classification.

**16.** Where the trial court is required by statute to make certain factual determinations, but its factual findings are inadequate for this court to determine whether the legal standards established by the statute have been met, we may remand the case for additional findings. *See, e.g., United States v. Vortis*, 785 F.2d 327, 329 (D.C.Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986); *Karriem v. Barry*, 743 F.2d 30, 31 (D.C.Cir.1984); *Prakash v. American Univ.*, 727 F.2d 1174, 1178 (D.C.Cir.1984). However, we will *not* remand a case for further factual findings where the plaintiff's own litigation strategy is largely to blame for the inade-

quate factual record. In the instant case, the appellees did not attempt to build a factual record at the trial court level sufficient to demonstrate a violation of a right specifically enumerated in the LMRDA. Nor did they contend on appeal that the *particular facts* of this case were relevant to the determination whether the statute had been violated. Rather, they consistently pursued this litigation on the legal theory that there is an absolute "right of access" to a union's mailing list under section 101(a) of the LMRDA, irrespective of the facts of the individual case. To order a remand at this late stage of the litigation, after the appellees have chosen to pursue a litigation strategy that eschews the need for factual determinations, would be tantamount to allowing the appellees to assert new legal theories not raised below. We decline to do so. *Cf. District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C.Cir.1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.").

riding objective'" in enacting Title I was to ensure that unions would be "'democratically governed'" and "'responsive to the will of the union membership as expressed in open, periodic elections'." 636 F.Supp. at 822 (quoting *Finnegan v. Leu,* 456 U.S. 431, 441, 102 S.Ct. 1867, 1873, 72 L.Ed.2d 239 (1982)); *see also id.* at 827 (suggesting that the relevant test is whether the union's conduct has interfered with the democratic goal of achieving a "fully informed vote"). While it cannot be gainsaid that Title I was enacted to ensure that unions adhere to certain "democratic" principles, we reject the conclusion of the District Court that this statutory purpose supports the creation of a substantive "right of access" to a union's mailing list.

First, Title I of the LMRDA is not a mandate for courts to impose on labor unions whatever procedures or practices they regard as "democratic." Although the enactment of Title I was certainly propelled by a congressional intent to broaden the democratic features of union governance, Congress did not embrace an amorphous and boundless notion of democracy. Rather, it enumerated specific rights designed to ensure that unions adhere to certain basic democratic principles. Those principles must be gleaned from the statute itself; they may not be derived from a court's perception of what internal union procedures are necessary to guarantee a "fully informed vote."

The mischief that is likely to result once the notion of union "democracy" is cut loose from its statutory moorings is readily apparent. If the democratic principle to be furthered is the untrammeled exchange of ideas, then why stop with the recognition of a statutory "right of access?" Why not require unions to adhere to a court-ordered schedule of "town meetings," or to devise other internal procedures that would facilitate the ultimate goal of a "fully informed vote?" We have not been offered, nor are we able to discern, any limiting principle to the boundless notion of "democracy" in-

voked by the District Court to support its holding that a "right of access" may be found under Title I of the LMRDA. *Cf. Grant v. Chicago Truck Drivers Union,* 806 F.2d 114 (7th Cir.1986) (rejecting the contention that section 101(a) requires unions to hold regular general membership meetings).

Second, in the collective bargaining context, the notion of "democracy" embodied in the LMRDA must be considered against the core principles that underlie the National Labor Relations Act ("NLRA"),[17] namely, majority rule and exclusive representation. Under the NLRA, unions, by virtue of their majority status, necessarily enjoy broad latitude in pursuing what they perceive as the collective good, subject of course to their duty of fair representation. This is so because Congress perceived that promotion of the collective bargaining process—at the expense of individual worker autonomy—would enable labor and management "to substitute peaceful means of dispute resolution—grievance procedures and arbitration—in place of economic warfare." *Fournelle v. NLRB,* 670 F.2d 331, 336 (D.C.Cir.1982); *see also id.* at 337 (so long as the selection of the bargaining representative remains free, the individual rights protected by section 7 of the NLRA may be waived through collective bargaining); *cf. NLRB v. Magnavox Co.,* 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed.2d 358 (1974) (such waivers will not be recognized "where the rights of the employees to exercise their choice of a bargaining representative is involved—whether to have no bargaining representative, or to retain the present one, or to obtain a new one").

In the instant case, it is not difficult to imagine how the Union's legitimate role as bargaining representative could be subverted by the broad "right of access" posited by the District Court. Pursuant to the injunctive "relief" ordered by the trial court, *any* Union member may obtain access to the Union's mailing list simply by

**17.** Codified as amended at 29 U.S.C. §§ 151–169 (1982 & Supp. III 1985).

*asserting* a desire to express his opposition to a proposed contract. Once this "right" is assured, however, there is nothing to prevent the member—possibly at the behest of management or an outsider willing to bear the cost of a mailing—from disseminating his views on any number of topics, including the legitimacy of the Union itself. Nothing in the LMRDA requires a union to turn the contract negotiation process into a forum in which dissident union groups (or outside groups working through union members) may utilize the union's own resources to undermine its policies and processes.

Of course, we do not mean to imply that a union, having attained majority status, may engage in conduct that deprives dissident union members of their right to an "equal" vote or their right to express their "views, arguments, or opinions." This is precisely what Title I of the LMRDA was designed to prevent. Nor do we mean to suggest that a union has a legitimate interest in suppressing speech about its policies or its status as bargaining representative. We merely hold that a union, having committed no violation of the LMRDA,[18] may not be ordered to supply the means by which those opposed to the union might seek to frustrate the performance of its collective bargaining responsibilities.

### III. Conclusion

For the reasons set forth above, the judgment of the District Court is reversed. The case is remanded to the trial court with instructions to enter judgment for the appellants.

*So ordered.*

---

**18.** Because the District Court failed to make a particularized finding that the appellants violated the statute, but instead embraced the erroneous view that an independent "right of access" exists under section 101(a), we have no occasion to examine the circumstances in which a union's denial of access to its mailing list might *contribute to* a violation of a right specifically enumerated in the statute. Thus, for example, we need not decide whether a union would violate subsections 101(a)(1) and/or 101(a)(2) by refusing to facilitate communication among voting members who are without access to alternative means of communication. Similarly, we need not decide whether access to a mailing list would be an appropriate remedy for a violation of Title I in those circumstances where members *do* have access to alternative means of communication. We hold only that there is no independent "right of access" to a union's mailing list under Title I of the LMRDA, and that court-ordered access in an individual case must be predicated on a particularized finding of a statutory violation.