ILLINOIS FRATERNAL ORDER OF POLICE LABOR COUNCIL, Petitioner-Appellant, v. ILLINOIS LOCAL LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

First District (3rd Division)    No. 1—00—1247

Opinion filed February 28, 2001.

Gary L. Bailey, of Western Springs, for petitioner.

Joel A. D'Alba, of Asher, Gittler, Greenfield & D'Alba, Ltd., of Chicago, for respondents Public Service Employees Union, Local 46, SEIU, AFL-CIO and Chicago Crossing Guard Association, Local 729, SEIU.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Jerald S. Post, Assistant Attorney General, of counsel), for respondent Illinois Local Labor Relations Board.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Suzanne M. Loose, Assistant Corporation Counsel, of counsel), for respondent City of Chicago.

JUSTICE WOLFSON delivered the opinion of the court:

The heretofore undecided question in this case is whether the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 1998)) permits three separate unions to jointly represent a single group of City of Chicago public safety employees. The Illinois Local Labor Relations Board said the answer is yes. We affirm.

BACKGROUND

On April 2, 1999, the Illinois Fraternal Order of Police Labor Council (Petitioner) filed a representation/certification petition with the Illinois Local Labor Relations Board (ILLRB). The Petitioner sought a representation election among a group of employees employed by the City of Chicago (Employer). The employees were included in a larger bargaining unit of the Employer's "public safety" unit, known as Unit II.

Unit II was and is jointly represented by three labor organizations: (1) Public Service Employees Union, Local 46, SEIU, AFL-CIO (PSEU); (2) Chicago Crossing Guard Association, Local 729, SEIU (CCGA); and (3) International Brotherhood of Electrical Workers, Local 165/21 (IBEW) (collectively the Incumbents). The Petitioner sought an election only among those employees within Unit II represented by PSEU and did not want to include employees serviced by CCGA or IBEW.

On June 23, 1999, Employer, later joined by PSEU and CCGA, moved to dismiss the petition, arguing the ILLRB had determined in earlier decisions that Unit II was a single unit and that it was an appropriate collective bargaining unit. The Petitioner responded that it would present evidence showing Unit II has become three separate bargaining units since ILLRB's last decision.

The administrative law judge (ALJ) conducted evidentiary hear-

ings, and on October 5, 1999, the ALJ found the petitioned-for unit was inappropriate because the employees whom Petitioner sought already were included in Unit II. The ALJ concluded Unit II was an appropriate bargaining unit and was properly represented by the Incumbents as a joint representative. The ALJ did not dismiss the petition, but instead directed a representation election in Unit II among all the members.

On April 7, 2000, the ILLRB affirmed the ALJ's finding that the petitioned-for unit was inappropriate, that Unit II was an appropriate unit for the purposes of collective bargaining, and that the Incumbents jointly represent the single bargaining unit.

On appeal, the Petitioner contends the ILLRB erred in finding (1) Unit II is an appropriate unit, in which the employees are represented by a single bargaining unit composed of the Incumbents, as opposed to the Incumbents representing the employees of Unit II as three separate and distinct bargaining units; and (2) the ALJ correctly refused to allow an election among only a portion of the existing bargaining unit, for the purpose of permitting the Petitioner to replace PSEU.

FACTS

In 1984, before the effective date of the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 1998)) (the Act), the Employer divided its unrepresented labor force into five bargaining units, based on the "community of interests" within each unit. One of the units became known as Unit II.

In 1984, Unit II included 15 titles: police dispatcher aide, security guard, security guard—CATC, senior security guard, coordinator fire safety/handicapped, animal control aide, senior public safety aide, community service aide, district coordinator beat program, crossing guards, animal control officer, animal control inspector, parking enforcement aide, traffic control aide, and detention aide.

The titles of police communication operator I, police communication operator II, aviation security officer, and aviation communications operator were added to the unit over the past 15 years. They are full-time employees.

Unit II now consists of 2,164 public safety employees who share the following characteristics: they are nonsworn, quasi-law enforcement personnel who wear uniforms, enforce various Employer ordinances, and are subject to civil suits for their actions.

After Unit II's creation, the Incumbents filed a petition with the Employer seeking to jointly represent Unit II. The American Federation of State, County and Municipal Employees (AFSCME) also petitioned to represent Unit II. In June 1984, the American Arbitra-

tion Association conducted an election, giving Unit II members a choice of representation by the coalition of incumbents or AFSCME. The Unit II members voted for the coalition of incumbents as their bargaining representative. At the time of the election, none of the Incumbents was tied to any particular group of employees within Unit II.

The record contains no information indicating how each Incumbent became the designated representative of the particular Unit II classifications. However, the recognition clause of the first collective bargaining agreement, which survives in each successor agreement, links the Incumbents with certain employee classifications within Unit II:

1. *The Chicago Crossing Guard Association, Local 729, SEIU, AFL-CIO*: The CCGA represents Unit II employees in the classification of crossing guards. The Employer employs 1,131 crossing guards, which are the majority of the 2,164 members of Unit II. Crossing guards work between 2 to 3½ hours a day during the school months, and are reassigned during the summer months to other jobs within the Chicago police department.

2. *Public Service Employees Union, Local 46, SEIU, AFL-CIO*: The PSEU represents Unit II employees in the classifications of community service aide, district coordinator beat program, animal control officer, animal control officer aide, animal control inspector, aviation security officers, security guard—CATC, security guard, senior security guard, parking enforcement aide, coordinator fire safety/handicapped, traffic control aide, senior public safety aide, and detention aides. PSEU represents only 656 of 2,164 employees in Unit II.

The Employer employs 24 animal control officers; 3 animal control inspectors; 189 aviation security officers; 194 detention aides; 69 parking enforcement aides; and 177 traffic control aides. There are no employees currently employed in the title of animal control aide, community service aide, district coordinator beat program, or senior public safety aide.

3. *International Brotherhood of Electrical Workers, Local Union 165/21, AFL-CIO*: The IBEW represents Unit II employees in the classifications of police communication operator I (PCOI), police communication operator II (PCOII), and aviation communications operator (ACO). The Employer employs 139 PCOIs, 200 PCOIIs, and 38 ACOs. The IBEW represents a total of 377 of 2,164 employees in Unit II.

These classifications, still in the current contract, except for changes in the job titles, were proposed to serve as a shield for the unions from liability for breaches of the duty of fair representation by one union against one or more of its members.

During initial contract negotiations with the Employer in 1985, the Incumbents retained a single attorney to act as their chief spokesperson. One or more representatives of each Incumbent served on the negotiating committee and participated in the negotiations. Throughout the negotiations, the parties always assembled as a group, and the Employer never held separate negotiations with any of the unions. The Incumbents always submitted joint proposals to the Employer in one package. The Employer would thereafter respond with its proposals, also arranged in one package.

As the parties reached tentative agreements, the chief spokesperson, as well as representatives of all three unions, signed them. The first contract was a single collective bargaining agreement covering all Unit II employees. Each Incumbent conducted a separate ratification vote of the employees it represented in Unit II; the votes were then commingled to determine whether a majority of all Unit II members had ratified the agreement. When it was determined that a majority of all the employees in Unit II had ratified, this single collective bargaining agreement was sent to the Employer's city council for ratification. On February 13, 1986, a single collective bargaining agreement was entered into by the Employer and Unit II.

In negotiations for successor agreements, the Employer and the Incumbents continued to adhere to these negotiation and ratification procedures. During subsequent negotiations, the Incumbents' chief spokesperson convened meetings where representatives of the Incumbents discussed and agreed upon their joint proposals in an effort to create a unified bargaining agenda.

The initial and successor collective bargaining agreements contain clauses regarding each of the Incumbent's particular members. The preamble of the initial agreement exists in each successor agreement and provides that the Incumbents are "three autonomous and independent labor organizations each representing certain employees in a portion of a single collective bargaining unit."

The recognition clause survived as well and provides that the Employer recognizes each Incumbent as "the sole and exclusive bargaining agent for those employees and/or employee classifications set out opposite the [Incumbent's] respective name" and "that each of the [Incumbents] is autonomous and is responsible solely to represent employees in the classifications enumerated."

The agreements establish wages, benefits, and other terms and conditions of employment applicable to all Unit II members. However, under the agreements, the Incumbents also separately administer the dues collection and grievance procedure provisions. Each Incumbent has a set amount for its monthly dues separate and distinct from that

of the other Incumbents. The Employer collects the dues from the employees each individual Incumbent represents and remits the amounts to that Incumbent.

Furthermore, under the grievance procedure, each Incumbent files and pursues its own grievances to arbitration, and arbitration decisions usually refer to the parties as the Incumbent which processed the grievance and the Employer. Finally, where unfair labor practices have arisen under these agreements each individual Incumbent has filed charges separately with the Board.

### The ALJ and ILLRB Decisions

After the hearing, on October 5, 1999, the ALJ directed an election in Unit II among all of its members. The ALJ noted that while the ILLRB had never before addressed the issue of joint representation under the Act, the National Labor Relations Board (NLRB), whose decisions are instructive for the ILLRB, had approved joint representation.

The ALJ found that joint representation was appropriate under the National Labor Relations Act (NLRA) (29 U.S.C. § 151 *et seq.* (1994)) even where constituent unions have different constitutions, bylaws, officials, wage rates, or grievance policies. The ALJ reasoned that the incumbent coalition was a joint representative because the parties bargain jointly for a single contract which covers Unit II as a whole, and that the votes of the membership of each labor organization are pooled to ratify the contract.

The ALJ also found the preamble and article I of the bargaining agreement were created in an attempt to allocate liability for any breach of fair representation committed by the individual labor organizations and did not undermine the incumbent coalition's joint representative status. The ALJ concluded that Unit II is an appropriate bargaining unit and is properly represented by the incumbent coalition.

The ILLRB rejected Petitioner's argument that Unit II consists of three separate bargaining units rather than a single bargaining unit represented jointly by the incumbent labor organizations. The ILLRB affirmed the ALJ's finding that Unit II is an appropriate unit for the purposes of collective bargaining, that the incumbent coalition jointly represents the single bargaining unit, and that an election among only a portion of Unit II, for the purpose of replacing PSEU with the Petitioner, would be improper.

This appeal followed.

DECISION

■ The Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1998)) governs judicial review of the ILLRB's decision and extends to all questions of law and fact presented by the record. 5 ILCS 315/9(i) (West 1998); *City of Tuscola v. Illinois State Labor Relations Board*, 314 Ill. App. 3d 731, 733, 732 N.E.2d 784 (2000).

■ Generally, the ILLRB is required to make certain factual determinations. We will reverse the ILLRB's factual determinations only if we conclude they were contrary to the manifest weight of the evidence. *City of Tuscola*, 314 Ill. App. 3d at 733. Under the manifest weight standard, the ILLRB's findings of fact are *prima facie* true and correct; the decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *City of Tuscola*, 314 Ill. App. 3d at 734.

The ILLRB's conclusions of law, however, are not entitled to the same deference, and we review them *de novo. City of Tuscola*, 314 Ill. App. 3d at 734. "Generally, courts will accord deference to the interpretation placed on a statute by the agency charged with its administration and enforcement. However, an agency's statutory interpretation is not binding on a reviewing court, and will be rejected, if unreasonable or erroneous." *City of Tuscola*, 314 Ill. App. 3d at 734.

■ When mixed questions of law and fact are involved, requiring an examination of the legal effect of a given set of facts, the ILLRB's resolution of such questions will be upheld if "reasonable, consistent with labor law and based on findings supported by substantial evidence." *Northwest Mosquito Abatement District v. Illinois State Labor Relations Board*, 303 Ill. App. 3d 735, 742, 708 N.E.2d 548 (1999). ILLRB resolutions involving mixed questions of law and fact will be overturned only if found to be "clearly erroneous." *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205, 692 N.E.2d 295 (1998).

Here, the Petitioner does not dispute any factual findings, but argues there was evidence entered into the record that the ALJ and the ILLRB failed to recognize in making their determinations. As such, the Petitioner raises issues of both law and fact, *i.e.*, interpretation of the Act coupled with application of the facts of the case.

## 1. THE ILLRB'S DECISION TO CERTIFY UNIT II AS AN APPROPRIATE BARGAINING UNIT WHERE THE INCUMBENT COALITION JOINTLY REPRESENTS UNIT II

The primary issue before this court is whether, under section 3(i) of the Act, the ILLRB's determination that the incumbent coalition is a single "labor organization" representing an appropriate bargaining unit is clearly erroneous.

■ The Act provides "[e]mployees of *** any political subdivision of the State *** have, and are protected in the exercise of, the right of self-organization, and may form, join or assist any labor organization, to bargain collectively through representatives of their own choosing on questions of wages, hours and other conditions of employment." 5 ILCS 315/6(a) (West 1998).

To implement this provision, section 9(a) provides:

"Whenever *** a petition has been filed:

(1) by a public employee or group of public employees or any labor organization acting in their behalf demonstrating that 30% of the public employees in an appropriate unit *** wish to be represented for the purposes of collective bargaining by a labor organization as exclusive representative ***." 5 ILCS 315/9(a)(1) (West 1998).

To be entitled to recognition under section 9 of the Act, the Incumbents must constitute a "labor organization." See *City of Chillicothe v. Illinois State Labor Relations Board*, 165 Ill. App. 3d 217, 226-27, 518 N.E.2d 734 (1988).

■ Section 3(i) of the Act defines a "labor organization" as "any organization in which public employees participate and that exists for the purpose, in whole or in part, of dealing with a public employer concerning wages, hours, and other terms and conditions of employment, including the settlement of grievances." 5 ILCS 315/3(i) (West 1998).

This section parallels section 2(5) of the National Labor Relations Act (NLRA) (29 U.S.C. § 152(5) (1994)). Since section 3(i) of the Act has not been interpreted by any Illinois court to include joint representatives as the single "exclusive representative" for all the employees in a bargaining unit—in which the only two parties are the employer and the joint representative—we are guided in our analysis by federal decisions to determine whether the Incumbents are, by definition, a "labor organization." See *Chief Judge of the Sixteenth Judicial Circuit v. Illinois State Labor Relations Board*, 178 Ill. 2d 333, 338, 687 N.E.2d 795 (1997) (Decisions of the NLRB and the federal courts guide Illinois courts in interpreting the Act); accord *Rockford Township Highway Department v. Illinois State Labor Relations Board*, 153 Ill. App. 3d 863, 874-75, 506 N.E.2d 390 (1987) ("As the legislative history of the ILPRA indicates a close parallel between the Illinois act and the [NLRA] [citation], we will follow Federal law ***").

The federal Act states, "[t]he term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists

for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5) (West 2000).

■ The National Labor Relations Board (NLRB), in administering the NLRA, for a long time has permitted, with judicial approval, joint representation. See *National Labor Relations Board v. National Truck Rental Co.*, 239 F.2d 422, 425 n.7 (D.C. Cir. 1956); *International Paper*, 325 N.L.R.B. 689, 691-92 (1998). Provisions of the Act similar to those of the NLRA are to be given like effect. *City of Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345, 538 N.E.2d 1146 (1989) ("[W]e deem it appropriate *** to examine Federal interpretations of the NLRA where those decisions are consistent with the purposes of our Act").

■ Under the NLRA, a joint representative is "the single exclusive representative for all the employees in the bargaining unit" in which the only two parties are the employer and the joint representative. *International Paper*, 325 N.L.R.B. at 691, citing *Pharmaseal Laboratories*, 199 N.L.R.B. 324, 325 (1972). The filing of a joint petition is a *prima facie* showing of the requisite intent of the joint petitioners to bargain jointly for the requested unit of employees. *Automatic Heating & Service Co.*, 194 N.L.R.B. 1065 (1972).

■ The NLRB has emphasized the following factors as indicative of joint representation: (1) the existence of a single chief spokesperson for the joint representative during collective bargaining negotiations; (2) the exchange of only joint proposals throughout negotiations; (3) the creation of one bargaining agenda by the joint representative; (4) the preparation of a single agreement signed by each member of the joint representative; (5) the application of the agreement's provisions to all unit employees; and (6) the pooling of ratification votes from each member of the joint representative. *International Paper*, 325 N.L.R.B. 689, 691 (1998).

Moreover, the NLRB has found joint representation appropriate despite the existence of different constitutions, bylaws, wage rates, grievance procedures, administrative offices, and elected officials. *International Paper*, 325 N.L.R.B. at 691, citing *Mead Foods, Inc.*, 146 N.L.R.B. 1515 (1964); *Swift & Co.*, 115 N.L.R.B. 752 (1956); *Utility Services*, 158 N.L.R.B. 592 (1966).

The ILLRB adopted federal standards in this case. The ILLRB found that in 1984 the Incumbents filed a representation petition with the Employer seeking to represent Unit II jointly. The form, completed by the Incumbents, listed their identities and added the word "jointly." The ILLRB held the form was *prima facie* evidence of the requisite intent of the Incumbents to bargain jointly. See *Automatic Heating & Service Co.*, 194 N.L.R.B. 1065 (1972).

The ILLRB also found the Incumbents' bargaining history demonstrated that the Incumbents bargain solely on behalf of Unit II as a whole. A chief spokesperson devises a joint bargaining agenda and acts on behalf of the Incumbents throughout negotiations. The Incumbents exchange joint proposals with the Employer, which bargains only with the Incumbents as a group. The parties reach a single collective bargaining agreement covering all Unit II employees, and the Incumbents pool their ratification votes. See *International Paper*, 325 N.L.R.B. at 691.

The ILLRB said it found ample evidence demonstrating the Incumbents acted as a joint representative on behalf of all Unit II members. It held the facts presented at the hearing were insufficient to overcome the finding of the Incumbents' intent to jointly represent Unit II. See *International Paper*, 325 N.L.R.B. at 691-92.

The ILLRB concluded the record evidence overwhelmingly demonstrated the Incumbents intended to jointly represent Unit II when they first filed a joint representation petition with the Employer and they have continued to jointly represent Unit II throughout their bargaining relationship with the Employer.

The ILLRB said public policy considerations support its conclusion, citing three fundamental policies of the Act: the preservation of historical patterns of bargaining; the cultivation of stability in labor relations; and the protection of the right of public employees to select collective bargaining relationships of their own choosing for the purpose of negotiating wages, hours, and other terms and conditions of employment. *City of Springfield*, 15 Pub. Employee Rep. (Ill.) par. 2036, No. S—RC—98—50 (ISLRB July 7, 1999), citing *American Federation of State, County & Municipal Employees, Council 31 v. County of Cook*, 145 Ill. 2d 475, 584 N.E.2d 116 (1991); *City of Evanston v. Illinois State Labor Relations Board*, 227 Ill. App. 3d 955, 592 N.E.2d 415 (1992).

The ILLRB held Unit II's membership selected the Incumbents as its exclusive bargaining representative in 1984. Since that time, the Incumbents and the Employer have enjoyed a 15-year history of collective bargaining that has resulted in the negotiation and execution of several agreements. At no time has the Incumbents' joint relationship or Unit II's structure demonstrated any sign of distress or instability which would warrant the action requested by Petitioner. The ILLRB therefore was reluctant to disturb Unit II, given the fundamental policies of the Act.

The ILLRB's prior orders support its decision. See *City of Chicago (Police Department)*, 11 Pub. Employee Rep. (Ill.) par. 3024, Nos. L—UC—94—033, L—RC—94—037 (ILLRB July 7, 1995); *City of*

*Chicago (Aviation Security Officers)*, 5 Pub. Employee Rep. (Ill.) par. 3020, No. L—UC—89—09 (ILLRB June 16, 1989); *City of Chicago (Security Guards)*, 2 Pub. Employee Rep. (Ill.) par. 3015, No. L—RC—85—17 (ILLRB June 2, 1986); *City of Chicago (Detention Aides)*, 2 Pub. Employee Rep. (Ill.) par. 3014, Nos. L—RC—86—02, L—UC—86—03, L—UC—86—13 (ILLRB June 2, 1986); *City of Chicago (Watley & Holcomb)*, 2 Pub. Employee Rep. (Ill.) par. 3009, No. L—RC—85—08 (ILLRB April 17, 1986).

To support its position that the Incumbents are not a joint representative, the Petitioner cites to language in the collective bargaining agreements negotiated between the Incumbents and the Employer. The relevant portions are contained in the preamble and in the recognition article of each of the four successive collective bargaining agreements.

The relevant portion of the preamble states:

"This Agreement is entered into by and between the *** ('Employer') and the *** ('Unions'), *three autonomous and independent labor organizations each representing certain employees in a portion of a single collective bargaining unit ***.*" (Emphasis added.)

The relevant portion of the recognition article provides:

"The Employer recognizes each Union set out below as the sole and exclusive bargaining agent for those employees and/or employee classifications set out opposite the Union's respective name below, excluding all other employees of the Employer.

*The Employer further recognizes that each of the Unions is autonomous and is responsible solely to represent employees in the classifications enumerated*:

\* \* \*

*During the term of this Agreement, each of the Unions shall be responsible for representing only employees in the classifications as respectively enumerated and listed above.*" (Emphasis added.)

The Petitioner relies on this language and the fact that the Incumbents act separately with respect to administrative functions to support its argument that Unit II is actually three separate bargaining units. The Petitioner also relies on evidence that the Incumbents maintain separate administrative facilities and constitutions, pursue their own grievances and unfair labor practice charges, and collect varying amounts of dues.

The Petitioner contends the Act does not specifically authorize the ILLRB to certify more than one union as an exclusive bargaining representative or to divide a bargaining unit for purposes of contract administration. Although nothing in the Act specifically prohibits the ILLRB from creating joint representation, the Petitioner asks this

court to consider whether the ILLRB acted contrary to the Act, which authorizes a "labor organization" to become the exclusive bargaining-unit representative only if it obtains the support of 30% of the public employees in an appropriate unit. See 5 ILCS 315/9(a)(1) (West 1998).

Because the ILLRB certified three unions—CCGA, PSEU, and IBEW—to act jointly as the "exclusive representative" for the single petitioned-for unit, the Petitioner argues the CCGA, by virtue of its majority status, enjoys excessively broad latitude in pursuing what it perceives as the collective good. That is, contends the Petitioner, the Incumbents do not need the support of employees represented by PSEU, thus depriving those public employees of "the fullest freedom in exercising the rights guaranteed" by the Act. 5 ILCS 315/9(b) (West 1998). See *Carothers v. Presser*, 818 F.2d 926, 934 (D.C. Cir. 1987) (An exclusive collective bargaining agent must enjoy the support of the majority of employees in the unit); accord *Human Development Ass'n v. National Labor Relations Board*, 937 F.2d 657, 665 (D.C. Cir. 1991).

The Petitioner also contends that if the Act does permit joint representation consistent with NLRB interpretations, it does not specifically authorize the Incumbents to divide up a bargaining unit, under a collective bargaining agreement, for purposes of contract administration and representation. The Petitioner suggests that under the ILLRB's current view, its authorization for the unions to divide up Unit II and administer the collective bargaining agreement separately rests on a dichotomy between contract bargaining and contract administration. The Petitioner contends the processing of grievances is inextricably linked with collective bargaining.

*National Labor Relations Board v. National Truck Rental Co.*, 239 F.2d 422, 425 (D.C. Cir. 1986), supports the ILLRB's view that a large bargaining unit "may seek joint representation by two or more labor organizations." In addition, the ILLRB cites several NLRB decisions for the proposition that, where the joint representative is "the single exclusive representative for all the employees in the bargaining unit" (*International Paper*, 325 N.L.R.B. at 691), the bargaining unit may be divided by unions for purposes of contract administration (see, *e.g.*, *Utility Services, Inc.*, 158 N.L.R.B. 592, 593 (1966); *Swift & Co.*, 114 N.L.R.B. 159, 160 (1955)).

■ The ILLRB never has departed from its finding that Unit II is an appropriate bargaining unit and holds the circumstances of this case provide no evidence compelling it to deviate from its finding that Unit II is a single bargaining unit jointly represented by a coalition of labor organizations known as the Incumbents.

The ILLRB reviewed the language of the Unit II collective bargaining agreement. It found the language also refers to the existence of a

single bargaining unit and, furthermore, that there is only one collective bargaining agreement which covers all of the classifications in Unit II—as opposed to three separate agreements.

While, as the Petitioner alleges, there may be no record evidence in this case that any one labor organization represents all of Unit II, the ILLRB found that neither is there any persuasive evidence that Unit II is, in fact, three separate units for the purpose of collective bargaining or that the three labor organizations do not represent all of Unit II as a coalition.

We hold the ILLRB's conclusions that the incumbent coalition constitutes a "labor organization" and that Unit II is a single bargaining unit jointly represented by the Incumbents are reasonable, consistent with labor law, and supported by substantial evidence. These conclusions are not clearly erroneous.

## II. THE ILLRB'S DECISION TO CERTIFY THE PETITIONED-FOR UNIT AS AN INAPPROPRIATE BARGAINING UNIT AND DENYING THE PETITIONER A REPRESENTATION ELECTION BETWEEN THE PETITIONER AND THE PETITIONED-FOR UNIT

■ The Petitioner now asserts that if it can't break up Unit II, it wants to become one of the Incumbents, replacing PSEU. By doing so, the Petitioner abandons its argument questioning the nature of Unit II, and instead asserts the ILLRB was wrong for not allowing the employees represented by PSEU to vote separately from the rest of Unit II to be represented by the Petitioner.

Where a petition seeks to remove employees from an existing unit and establish them as a separate unit with a different representative, the question of the appropriateness of the separate unit must be guided by proper standards for such a severance. *City of Chicago (Security Guards)*, 2 Pub. Employee Rep. (Ill.) par. 3015. Despite failing to raise a severance analysis, the Petitioner nonetheless argues it should be entitled to replace PSEU and not sever the employees now represented by PSEU from Unit II. The Petitioner suggests the ILLRB should have found PSEU's employees are an appropriate bargaining unit under section 9(b) (5 ILCS 315/9(b) (West 1998)) and allowed a representation election among only those employees within Unit II represented by PSEU.

The Incumbents contend the decision of the ILLRB is not contrary to the policies of the Act and is consistent with important labor principles. Specifically, the Incumbents contend the creation of a separate unit of former employees now represented by PSEU is highly inappropriate because the separation would lead to fragmentation. They also argue the separation fails to take into account both the

configuration of existing units and the relative community of interest of the employees in the unit already in place.

In determining the appropriateness of a petitioned-for collective bargaining unit, section 9(b) of the Act provides:

> "The Board shall decide in each case, in order to assure public employees the fullest freedom in exercising the rights guaranteed by this Act, a unit appropriate for the purpose of collective bargaining, based upon but not limited to such factors as: historical pattern of recognition; community of interest including employee skills and functions; degree of functional integration; interchangeability and contact among employees; fragmentation of employee groups; common supervision, wages, hours and other working conditions of the employees involved; and the desires of the employees. For purposes of this subsection, fragmentation shall not be the sole or predominant factor used by the Board in determining an appropriate bargaining unit." 5 ILCS 315/9(b) (West 1998).

Section 9(b) does not require that a proposed unit be the most appropriate unit. Rather, it requires that the unit be appropriate. *County of Peoria v. Illinois State Labor Relations Board*, 305 Ill. App. 3d 827, 831, 713 N.E.2d 745 (1999). However, a bargaining unit will not be appropriate if, under all of the circumstances, it is artificial or arbitrary. *Sedol Teachers Union v. Illinois Educational Labor Relations Board*, 276 Ill. App. 3d 872, 883, 658 N.E.2d 1364 (1995).

In the present case, the basis of the ILLRB's rejection of the petitioned-for unit is set forth in the ILLRB's order as follows: "on five separate occasions we have specifically approved of the composition of Unit II and have dismissed any attempts at severing Unit II." In a footnote, the ILLRB explains:

> "In doing so, we reject the Petitioner's suggestion that an election be held among those employees linked to [PSEU] in the parties' collective bargaining agreements in an effort to determine whether those particular employees seek to substitute the Petitioner into the joint representative, replacing [PSEU]. As Unit II is one bargaining unit, the subset of Unit II employees linked to [PSEU] is not an appropriate unit for election purposes under the Act. In order to effect a change in the joint representative, all of Unit II's membership would have to vote on that change."

ILLRB precedent would hold Unit II does not qualify as an "historic bargaining unit" that is presumed to be appropriate. See *Illinois Department of Central Management Services*, 3 Pub. Employee Rep. (Ill.) par. 2026, No. S—RC—258 (ISLRB March 9, 1987). That is because Unit II did not function as a bargaining unit until shortly after the Act became effective. At the same time, the first paragraph of section 9(b) includes "historical patterns of recognition" as one of the

factors to be considered when determining an appropriate bargaining unit. Here, the ILLRB was entitled to take into account 15 years of bargaining by the Incumbents on behalf of Unit II and the negotiation of five different collective bargaining contracts. See *City of Chicago*, 2 Pub. Employee Rep. (Ill.) par. 3015.

The ILLRB's reliance on its previous decisions and its conclusion that Unit II is a single bargaining unit—appropriate for the purpose of collective bargaining and jointly represented by a coalition of labor organizations known as the Incumbents—is not clearly erroneous.

Because we find Unit II is an appropriate bargaining unit and the Incumbents the joint exclusive representative of Unit II, we conclude the ILLRB correctly found the petitioned-for unit inappropriate because an election conducted solely in a segment of the larger bargaining unit, Unit II, is not authorized under the Act. The ILLRB decision was, therefore, not clearly erroneous.

CONCLUSION

For reasons stated, we affirm the ILLRB.

Affirmed.

CERDA and BURKE, JJ., concur.