# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Rose v. Board of Trustees of the Mount Prospect Police Pension Fund,*
2011 IL App (1st) 102157

---

| Appellate Court Caption | MICHAEL D. ROSE, Petitioner-Appellee, v. THE BOARD OF TRUSTEES OF THE MOUNT PROSPECT POLICE PENSION FUND, Defendant-Appellant. |
|---|---|
| District & No. | First District, Fourth Division<br>Docket No. 1-10-2157 |
| Filed | September 15, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Petitioner was entitled to a full "line-of-duty" disability pension for the back injury he suffered in an automobile accident while on duty as a police officer and a second accident that occurred several months later while he was off duty, and the Pension Board's denial of a "line-of-duty" disability pension was reversed, since the Board's conclusion that the on-duty accident was not a contributing cause of petitioner's undisputed disability was against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-06026; the Hon. Nancy J. Arnold, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Richard J. Reimer and Jeffrey A. Goodloe, both of Richard J. Reimer & Associates LLC, of Hinsdale, for appellant. |
|---|---|
| | Thomas W. Duda, of Law Offices of Thomas W. Duda, of Arlington Heights, for appellee. |
| Panel | JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion. |
| | Justices Pucinski and Sterba concurred in the judgment and opinion. |

**OPINION**

¶ 1        The petitioner-appellee, Michael D. Rose, was a patrol officer in the Village of Mount Prospect Police Department. On February 21, 2004, while on patrol and driving his squad car, the petitioner was injured in an automobile accident. The petitioner was subsequently involved in a separate and undisputably off-duty automobile accident, on June 1, 2004.[1]

¶ 2        As a result of his February 21, 2004, accident, the petitioner filed an application with the board of trustees of the Mount Prospect Police Pension Fund (hereinafter Pension Board) requesting a "line-of-duty" pension pursuant to section 3-114.1 of the Illinois Pension Code (hereinafter Pension Code) (40 ILCS 5/3-114.1 (West 2006)) and contending that he suffered a permanent disabling injury (namely, herniated discs in his lower back). In the alternative, the petitioner requested a "nonduty" disability pension pursuant to section 3-114.2 of the Pension Code (40 ILCS 5/3-114.2 (West 2006)). The Board denied the petitioner's request for a "line-of-duty" disability pension, but granted his request for a "nonduty" disability pension. In doing so, the Pension Board found that the petitioner was not entitled to a "line-of-duty" pension because: (1) the February 21, 2004, accident did not occur while the petitioner was performing an "act of duty"; and (2) the February 21, 2004, accident was not a contributing cause of the petitioner's undisputed disability; rather, that disability was caused by the injuries the petitioner sustained in the later June 1, 2004, off-duty accident.

¶ 3        The petitioner sought administrative review of the Pension Board's decision with the circuit court pursuant to section 3-103 of the Code of Civil Procedure (hereinafter Civil Procedure Code) (735 ILCS 5/3-103 (West 2006)). The circuit court granted the petitioner's complaint for administrative review, reversed the Pension Board's decision, and entered judgment in favor of the petitioner, specifically finding that he was entitled to a "line-of-duty" pension. The Pension Board now appeals, asking that we reinstate its original order

---

[1] The petitioner has filed two separate civil lawsuits against the individuals involved in each accident. These lawsuits are not related to the issues raised in this appeal.

denying petitioner's request for a "line-of-duty" pension. For the reasons that follow, we affirm the decision of the circuit court.

¶ 4                                   I. BACKGROUND

¶ 5       The record, which is fairly cumbersome, reveals the following relevant facts and procedural history. After the petitioner filed his request for a "line-of-duty" pension on April 30, 2007, the Pension Board held two administrative hearings on the petitioner's application. During those hearings, the Pension Board suggested that the petitioner amend his application and alternatively request a "nonduty" disability pension without prejudice to his claim for a "line-of-duty" disability pension. The petitioner complied with this advice and amended his application.

¶ 6                          A. The Administrative Hearings

¶ 7       After the petitioner amended his application, the Pension Board heard the petitioner's testimony and reviewed voluminous evidence introduced into the administrative record. That evidence consisted of over 30 exhibits and included, *inter alia*: (1) various village police and administrative records concerning the petitioner's assignment and movements on February 21, 2004, as well as the car accident in which the petitioner was involved on that date; (2) the petitioner's pleadings and deposition testimony in the civil lawsuits against the individuals involved in the February 21, 2004, and June 1, 2004, car accidents; (3) medical reports and records from the petitioner's family physician, Dr. John Cottrell, who was the first to treat the petitioner after his February 2004 accident; (4) numerous medical records from institutions where the petitioner has been treated since his February 21, 2004, accident (including records from Holy Family Hospital, the Lutheran General Spine Center, Northwest Community Hospital, Adult Pediatric Orthopedics, S.C., the Condell Medical Center, the Loyola Medical Center, and the Illinois Bone and Joint Institute); (5) depositions of the following treating physicians, Dr. Michael Jacker, Dr. Martin Lannoff, and Dr. Jay Levin; (6) depositions of Dr. Alexander John Ghanayem, and Dr. Thomas Gleason, who were asked by the village and the village's insurer carrier, respectively, to evaluate the petitioner for purposes of his workers' compensation benefits claim; (7) a medical evaluation by Dr. Samuel Chmell, the petitioner's medical expert; and (8) three independent medical evaluations of the petitioner for purposes of his disability pension, performed by Dr. Gary Shapiro, Dr. Miledones Eliades, and Dr. Gary Yarkony, and ordered by the Pension Board, pursuant to section 3-115 of the Pension Code (40 ILCS 5/3-115 (West 2006)). For purposes of brevity, we address and summarize only that testimony and those exhibits which are relevant to this appeal. We do so in chronological order.

¶ 8                    1. Evidence Regarding the February 2004 Accident:
                  The Petitioner's Testimony and Relevant Village Records

¶ 9       During the administrative hearings, the petitioner first testified that he was a patrol officer for the Village of Mount Prospect (hereinafter the Village) since January 2, 2001. The

petitioner denied having suffered from any injuries prior to his employment by the Village and testified that prior to being hired as a patrol officer, he was ordered to undergo a physical examination, which he passed with no reservations.

¶ 10    The petitioner next testified about his duties as a patrol officer. The petitioner explained that his duties required that he "actively patrol the Village" (either in the squad car or on foot, and sometimes even on a bicycle, as a member of the police bicycle unit) in order to protect "the property and person of the citizens of the Village." As part of his daily patrol duties the petitioner had to conduct traffic stops, respond to calls, interview witnesses and suspects, and on occasion aid the coroner and act as an evidence technician. The petitioner further stated that he was required to be physically prepared to restrain an offender or suspect, at any time, and that this often involved "twisting, bending and lifting of extreme nature." The petitioner's duties were varied and could require the petitioner to stand on his feet for long periods of time (such as in monitoring traffic), or could require him to be seated (such as in conducting long interviews). The petitioner also testified that as part of his job as a patrol officer, he was regularly required to wear duty gear, including police boots, a bulletproof vest, a duty belt made of leather, loaded weapons, two magazines with ammunition, handcuffs, a baton, a flashlight, and various other equipment.

¶ 11    The petitioner next testified regarding the events of February 21, 2004. He stated that on that date he was 24 years old and was assigned to an afternoon patrol shift from 3 p.m. to 11 p.m. According to the petitioner, at about 2:45 p.m., he attended roll call, at which point he was in good health. The petitioner was assigned to investigate a missing juvenile. He was dispatched to a residential address, where he spoke to the mother of the missing juvenile for about 15 to 30 minutes. During the course of this interview, the petitioner received another dispatch from Northwest Central Dispatch instructing him that the juvenile and a couple of his friends "may be" at a Citgo gas station located at the corner of Rand and Euclid Roads in Mount Prospect. After receiving this information, the petitioner proceeded to the gas station, where he arrived about 15 to 20 minutes later. Once there, the petitioner exited his vehicle and spoke to the gas station attendant, who told him that the juvenile had just been at the station and had left only a couple of minutes ago, on foot, heading southeast on Rand Road. The petitioner testified that he returned to his vehicle, intending to drive along Rand Road until he could locate the juvenile, take him into custody and bring him back to his mother.

¶ 12    According to the petitioner, however, as he attempted to exit the gas station onto Rand Road, by turning left, his squad car was hit by another vehicle, driven by a civilian, Christina Cappozzi. Cappozzi's vehicle struck the front driver's side of the squad car. The petitioner felt the car jerk back, and he hit his head on the molding between the windshield and the door. The petitioner advised Northwest Central Dispatch of the traffic accident and then exited his vehicle to see if Cappozzi was injured.[2]

_____

[2]The official traffic crash report for the February 21, 2004 accident corroborates the petitioner's version of the traffic accident. That crash report reveals that while the petitioner was driving his squad car he was hit by a 2002 Chevy Cavalier being driven by Christina Cappozzi.

¶ 13    With respect to the February 2004 accident, the Pension Board offered into evidence several Village records regarding the petitioner's movements on that day, including, *inter alia*: (1) the petitioner's "Mount Prospect Police Department Officer's Daily Activity Report" dated February 21, 2004; and (2) the Mount Prospect police department's official police report detailing the missing juvenile call, including the dispatch center's logs. The Pension Board also introduced into evidence a copy of the petitioner's deposition taken in his civil lawsuit against Christina Cappozzi.

¶ 14    The petitioner's deposition details the manner in which the police department tracks the movements of police officers while they are on patrol. In that deposition, the petitioner explained that each time a call is assigned to an officer, a computer-aided dispatch (or CAD) sheet is created. The police officer can make additions to the CAD sheet by using his in-car computer and by notifying the police department of his whereabouts and any actions he takes during the day. An officer can ask the dispatch center to add information that the officer learns on the scene, or to look into suspects of whom the officer has learned and retrieve information about them for the officer. According to the petitioner, the officer ultimately has to put codes onto any dispatch call and end it once the call has been completed.

¶ 15    The official police investigation report for February 21, 2004, introduced by the Pension Board, indicates that the missing juvenile's mother entered the police station and reported her son missing at 14:32. The petitioner's daily activity log shows that he interviewed the mother at her home from 16:47 to 17:18. The log further reveals that the petitioner received a call from dispatch regarding the missing juvenile at 17:19:02. That dispatch report informed the petitioner that the juvenile was last seen at a Citgo gas station at the intersection of Rand Road and Euclid Road. The daily log next reveals that the petitioner proceeded to the gas station, as an assisting officer, where he conducted an "investigation" from 17:20 to 17:28. The petitioner coded this investigation as "Assist 3182."

¶ 16    The official police report reveals that the petitioner's last transmission with the dispatch center regarding the call was "NO JUVS HERE" and that the petitioner then coded the call "CLEAR" and "CLOSE" at 17:30:01.[3] The petitioner's next and final entry for that day is the motor vehicle accident that occurred when he left the gas station.

¶ 17    When cross-examined by the Pension Board regarding his dispatch records, the petitioner testified in the following manner. When asked whether he had "completed the call," the

According to the crash report, traffic was stopped in both northwest-bound lanes on Rand Road. The petitioner made a left-hand turn out of the gas station's parking lot and across the two northwest-bound lanes of Rand Road in an attempt to drive southeast on Rand Road. At the same time, Cappozzi drove her vehicle northwest on the painted median lane separating the northwest and southeast-bound lanes of Rand Road and struck the petitioner's squad car on the front driver's side. Photographs of the scene, attached to the crash report, reveal bumper damage and a cracked driver's side headlamp on the petitioner's squad car.

[3]Nothing in the official police report of the petitioner's own daily log indicates that he told dispatch that he spoke with the gas station attendant or that he received information regarding the juvenile's possible whereabouts.

petitioner stated that he could not remember and that another officer could have "coded it out" for him due to the traffic accident. The petitioner also admitted that after he was released from the emergency room he returned home rather than to the police station to complete his shift. On cross-examination, the petitioner further admitted that when he left the gas station, he was not "actively pursuing anyone." He also acknowledged that the emergency lights on his marked squad car were not activated before the accident occurred. In his deposition in the civil lawsuit, the petitioner similarly admitted that as he was exiting the gas station, the "status of the case at the time did not make it an emergency," and he did not "have to use extraordinary efforts to get out of the gas station and head southeast bound on Rand Road."

¶ 18        2. Evidence Regarding the Petitioner's Treatment and the Second

Off-Duty Accident: The Petitioner's Testimony and Relevant Medical Records

¶ 19        During the administrative hearings, the petitioner next testified regarding his injury and prolonged attempt at treatment. The petitioner admitted that immediately after the accident, he neither felt pain nor noticed anything out of the ordinary with his back. However, about 45 minutes later, in the course of the investigation into the car accident, the petitioner began noticing an increasing pain, discomfort and stiffness in his neck and lower back. The petitioner immediately contacted his supervisor, Sergeant Lee, and drove back to the police station, where Sergeant Lee called for an ambulance. The petitioner was transported to the emergency room at Northwest Community Hospital, where he was examined and X-rayed. Medical records introduced by the Pension Board reveal that the X-rays taken at Northwest Community Hospital were "all completely normal," did not reveal any "evidence of fracture or dislocation" or any "significant bony injuries in the cervical or the lumbar spine" but, rather, showed that "[t]he vertebral bodies, their appendages and interspaces appear normal."

¶ 20        The petitioner stated that after leaving the emergency room, on February 23, 2004, he followed up with his family physician, Dr. John Cottrell. Dr. Cottrell prescribed pain medication and muscle relaxants and ordered the petitioner to undergo physical therapy at Holy Family Hospital and not return to work until March 9, 2004. On March 9, 2004, the petitioner was examined by Dr. David Spencer from the Lutheran General Spine Center. Medical records from the Lutheran General Spine Center introduced by the Pension Board reveal that on March 9, 2004, after examining the petitioner, Dr. Spencer wrote to Dr. Cottrell that "[the petitioner] is making a good recovery from a simple lumbar and cervical strain and I anticipate no need for any further diagnostic studies or specific treatment." Dr. Spencer's dictation notes similarly state that the petitioner is recovering from "a simple back sprain" and note Dr. Spencer's recommendation that the petitioner be given a nonsteroidal anti-inflammatory medication and that he return to full duty on March 19, 2004.

¶ 21        The petitioner next testified before the Board that he returned to work on March 9, 2004, but that on recommendation from his physicians, he was assigned to "light duty capacity"[4]

---

[4]The petitioner explained that "light duty capacity" included working at the front desk answering telephone calls, handling walk-ins, taking reports, as well as conducting interviews with

through April 4, 2004. The petitioner stated that he began physical therapy at Holy Family Medical Center on March 24, 2004. On cross-examination, the petitioner admitted that on March 30, 2004, he told his physician that the pain was no longer constant, and that on April 9, 2004, he said that "if 100 percent is perfect, I would say I'm at 90 percent." The petitioner explained, however, that these were daily reports to his physicians and that the pain he was experiencing varied from day to day depending upon his activities, so that although it would seem to subside one day, but then return "in full force" the next.

¶ 22    The petitioner testified that on April 5, 2004, he returned to full duty patrol responsibilities at work. He explained, however, that he asked Dr. Cottrell to permit him to return to his full duty patrol responsibilities, because he was receiving pressure from his supervisors to return to "the streets," and to "just take some pain medication and deal with it." The petitioner averred that after he returned to "full duty" he continued to experience pain (including burning, stabbing and dull pain in his lower back, waistband, left buttock and upper thigh). The petitioner returned to Dr. Cottrell on May 21, 2004. On that day, Dr. Cottrell restarted the petitioner on pain medication and ordered X-rays of his lower back. Dr. Cottrell also referred the petitioner to an orthopedic surgeon, Dr. Michael Jacker.

¶ 23    The petitioner testified that shortly thereafter, upon advice from Dr. Cottrell, he made an appointment to see Dr. Jacker. However, before he could keep this appointment, the petitioner was involved in a second, off-duty car accident on June 1, 2004. The petitioner was again taken to the emergency room, this time at Holy Family Hospital, where X-rays were taken. The emergency room records from Holy Family Hospital, introduced by the Pension Board, reveal that the petitioner stated that he was traveling about 40 miles per hour when he was struck on the passenger side by a vehicle traveling approximately 10 to 15 miles per hour. The emergency room records further noted that the petitioner had injuries to his "lower back and buttock."[5]

¶ 24    On cross-examination, the petitioner admitted that he did not report the June 1, 2004, accident to any of his treating physicians or to the Village of Mount Prospect police department. The Village records introduced by the Pension Board reveal that the Village did not become aware of this accident until May 2007 (three years after the incident), when the Village's new workers' compensation carrier ran a routine insurance search of the petitioner's name.

¶ 25    The petitioner next testified that on June 5, 2004, he went in for the X-rays that Dr. Cottrell had ordered for him prior to his second accident. On June 7, 2004, he also kept his appointment with Dr. Jacker, which had been scheduled prior to the accident. According to the petitioner, after an examination, Dr. Jacker ordered an MRI of the petitioner's lower back. That MRI, taken at Condell Medical Center, on June 11, 2004, revealed herniation of

---

victims or suspects brought into the police station.

[5]We note that in his deposition taken on February 7, 2007, for purposes of his civil lawsuit regarding the February 21, 2004, accident, the petitioner testified that he did not suffer any injuries in the June 1, 2004, accident.

the petitioner's lower back at the L3-L4 level and a bulging disc at the L4-L5 level. Based on the MRI reports, Dr. Jacker diagnosed the petitioner with a "left lumbar myfascial sprain with persistent symptoms," and he ordered a set of epidural injections for the petitioner, to be administered by his colleague, Dr. Martin Lannoff.[6]

¶ 26    Medical records from Dr. Jacker and Dr. Lannoff establish the following treatment of the petitioner. Dr. Lannoff administered the first epidural steroid injection on July 1, 2004. On July 20, 2004, the petitioner returned to Dr. Lannoff for a second epidural shot and reported to him that he was "50% improved." At that time, Dr. Lannoff released the petitioner to full and unrestricted police duties. On August 23, 2004, Dr. Jacker reexamined the petitioner and attributed the petitioner's continued, but diminished, pain to the same disk protrusion at level L3-L4. Dr. Jacker continued to allow the petitioner to remain on full duty at the police station. On October 18, 2004, Dr. Jacker again examined the petitioner and noted that the "only symptoms [the petitioner continued to experience were] soreness or slight achiness in his lower back sometimes associated with wearing the belt he wears at work as a police officer. He has no lower extremity symptoms." He noted that the petitioner was doing "very well" and that his symptoms had become "very minimal."

¶ 27    On January 24, 2005, the petitioner returned to Dr. Jacker because the pain in his back and thigh suddenly worsened. Dr. Jacker ordered further physical therapy, prescribed more anti-inflammatory and pain medication, and ordered another MRI. The second MRI, performed at Condell Medical Center on May 11, 2005, revealed disc protrusions at levels L3-L4 and L4-L5. On November 14, 2005, Dr. Jacker ordered an additional epidural injection, which was administered by Dr. Lannoff on November 29, 2005.

¶ 28    The petitioner testified before the Board that in the following months the pain in his lower back persisted and became worse when he wore his full duty patrol gear. The petitioner returned to Dr. Jacker on December 15, 2005. Dr. Jacker restricted the petitioner to "light duty status" at work and referred him to Dr. Jay Levin to discuss surgical options.

¶ 29    The petitioner saw Dr. Levin on January 4, 2006. After a physical exam, a CT scan, a lumbar myelogram, and a "Somatosensory Evoked Postentials" (SSEP) test, Dr. Levin advised the petitioner that there was a "significant nerve conduction delay going down from his left buttock into his left foot." Dr. Levin also confirmed that there was a herniation at level L3-L4 and a bulging disc at level L4-L5. He discussed surgical options with the petitioner, but he wanted a second opinion and referred the petitioner to another orthopedic surgeon, Dr. Regan. After the petitioner was examined by Dr. Regan, Dr. Levin scheduled the petitioner for surgery.

¶ 30    Prior to the petitioner's surgery, however, the Village's workers' compensation administrator ordered the petitioner to undertake a medical evaluation by Dr. Ghanayem. According to the petitioner, Dr. Ghanayem confirmed the diagnosis from Dr. Levin and Dr. Regan.

¶ 31    The petitioner had outpatient surgery performed at Northwest Community Hospital on

---

[6]In a letter dated June 30, 2004, Dr. Jacker attributed the petitioner's continued symptoms to a protruding disc at L3-L4 caused by the motor vehicle accident on February 21, 2004.

April 11, 2006. Although the pain in petitioner's leg subsided after the surgery, the petitioner continued to experience extreme muscle spasms and pain in his lower back. As a result, on April 10, 2006, he was taken off work completely. While recovering at home, the petitioner received his full pay under the Public Employee Disability Act (5 ILCS 345/1 *et seq*. (West 2006)). That temporary disability pay was terminated on August 21, 2006, after petitioner was examined by Dr. Thomas F. Gleason, on behalf of the Village's workers' compensation carrier.

¶ 32 The petitioner went through physical therapy with Dr. Levin which did not improve his condition. A third MRI was performed on June 30, 2006, based upon which Dr. Levin diagnosed him with "diskogeni mechanical back pain." On August 23, 2006, the petitioner returned to light duty at work, and he continued with his physical therapy through November 2006. As the pain in his back persisted, he returned to Dr. Lannoff and received three more epidural injections.

¶ 33 Because the petitioner's symptoms were not alleviated, on December 18, 2006, Dr. Lannoff recommended that he undergo a functional capacity evaluation test (FCE) at Lake Forest Hospital. The test, which was completed on December 18, 2006, revealed that the petitioner was no longer able to do full duty police work. The petitioner permanently left the Village police department on January 29, 2007. Since then he has not worked as a police patrol officer for the Village or anywhere else. The petitioner testified that he is currently employed as a full-time sales account executive for EcoLab and has been with them since March 2008. The petitioner stated that he still continues to experience pain and burning in his lower back, depending upon the type of activities he is performing, such as sitting or standing for prolonged periods of time. He admitted that he has not sought treatment since January 2007, but explained that his physicians have told him that there is no other treatment option, except for fusion surgery.

¶ 34                    3. Treating Physicians' Deposition Testimony

¶ 35 During the administrative hearings, the Pension Board introduced voluminous depositions of several of the petitioner's treating physicians.[7] For purposes of brevity, we relate only those portions of the depositions that are relevant to the issues raised in this appeal.

¶ 36                              a. Dr. Michael Jacker

¶ 37 Dr. Michael Jacker was deposed on September 7, 2007, and acknowledged that he was the first non-emergency room physician to examine the petitioner after his second, June 1, 2004, accident, as well as the first physician to recommend steroid injections for the petitioner's back. Dr. Jacker testified that he first examined the petitioner on June 7, 2004.

---

[7]We note that all of these depositions were taken pursuant to petitioner's two personal injury cases arising from the February and June 2004 accidents and were completed before the petitioner requested a disability pension from the Board.

He admitted that during the course of his diagnosis and treatment of the petitioner, he was unaware of the petitioner's June 1, 2004 accident, even though that accident occurred only six days prior to the petitioner's first appointment with him. Dr. Jacker testified that during that first examination, he was under the impression that the petitioner was "markedly improving" from his February 21, 2004, accident. Although Dr. Jacker acknowledged that it was possible that the June 1, 2004, accident exacerbated the petitioner's condition, he testified that his current awareness of this accident does not affect his opinion that the first, February 21, 2004, accident originally caused the petitioner's underlying conditions.

¶ 38                                                    b. Dr. Martin Lannoff

¶ 39        Dr. Martin Lannoff was deposed on December 19, 2007, and testified that he never fully examined the petitioner because his treatment was limited to administering two steroid shots to the petitioner's back on the referral of Dr. Jacker. Dr. Lannoff testified that the petitioner suffered from a degeneration of discs prior to either accident. He stated that in an August 29, 2006, letter he attributed the petitioner's lower back pain to the February 21, 2004, accident, which he believed exacerbated the petitioner's preexisting condition. He acknowledged, however, that the petitioner never informed him of his second, June 1, 2004, accident, and he stated that, now knowing of this second accident, and considering the petitioner's preexisting degenerative discs, he could not give a opinion as to which accident, if any, caused the petitioner's disability.

¶ 40                                                    c. Dr. Jay Levin

¶ 41        Dr. Jay Levin was deposed on September 4, 2007, and acknowledged that he performed the petitioner's back surgery on April 11, 2006. Dr. Levin testified that both the February and June 2004 accidents contributed to the petitioner's disability. Dr. Levin stated that the degenerative changes in the petitioner's L3-L4 disc preexisted either accident. Dr. Levin further testified that although in a letter dated January 19, 2006, he noted that the petitioner's disability "without question" was caused by "the same problem that occurred with the incident of February 21, 2004" and that "[t]he degenerative changes in [petitioner's] disk are not the basic reason for his current complaints but rather the injury of February 21, 2004, and the normal history of such a condition," these statements were made without any knowledge of the petitioner's June 1, 2004, accident. Once Dr. Levin became aware of the petitioner's June 1, 2004, accident, he opined that no single accident "absolutely caused" the petitioner's herniated discs. With knowledge of the second accident, he concluded that both accidents were "contributory" to the petitioners' disability, stating that the June 1, 2004, accident could have anywhere from "some" to "some greater amount of involvement" in the petitioner's disability and that it would be "unrealistic" to believe that the February 21, 2004, occurrence did not play a role in the petitioner's disability.[8]

_____

[8]During his deposition, Dr. Levin also stated that nobody "could definitively give an opinion to a reasonable degree of medical and surgical certainty [as to which accident absolutely caused the disability]."

¶ 42 Dr. Levin also testified that, depending on how the medical records between February and June 2004 were interpreted, during this period, the petitioner could be perceived as "anywhere from somewhat better, to completely better, or maybe better, maybe not better." Lastly, Dr. Levin testified that the June 2004 accident was "more likely" the cause of the petitioner's herniated disc. In coming to this conclusion, he noted that the fact that the petitioner did not tell any of his physicians about the June 2004 accident is "the most critical situation here." However, in coming to this conclusion, Dr. Levin acknowledged that he did not rule out the petitioner's first accident as a contributory cause of his disability.

¶ 43 ### 4. The Board's Three Independent Medical Evaluations

¶ 44 Pursuant to section 3-115 of the Pension Code (40 ILCS 3-115 (West 2006)), the Pension Board appointed three independent medical evaluators to determine the extent and cause of the petitioner's disability. These evaluations were introduced as evidence at the petitioner's pension hearings. As shall be elaborated below, all three physicians found that the petitioner was permanently disabled and that the disability was at least in part caused by the February 21, 2004, car accident.

¶ 45 ### a. Dr. Gary Shapiro

¶ 46 Dr. Gary Shapiro, a spine surgeon with the Illinois Bone and Joint Institute, examined the petitioner on October 30, 2007, and issued a certificate finding that the petitioner was permanently "disabled." Dr. Shapiro attached a report explaining his findings. In that report, Dr. Shapiro concluded that "full time disability [was] reasonable given the job requirements [of] a police officer." After examining the petitioner and reviewing his medical records, Dr. Shapiro noted that prior to the February 21, 2004, accident, the petitioner suffered from a preexisting degenerative disc disease at L3-L4 "since the lack of hydration would not have occurred at the time of injury," but that the disc bulging and impingement on the existing nerve roots" as well as the "disc herniations" were sustained at the time of the February 2004 accident. Dr. Shapiro further noted that the subsequent, June 1, 2004, car accident "most likely reaggravated the degenerative disc disease pain from the original accident." Dr. Shapiro concluded that the petitioner's explanation of how the injury occurred was consistent with his findings.

¶ 47 ### b. Dr. Miledones N. Eliades

¶ 48 Dr. Miledones Eliades, a physician with the Center for Spine Care in Evanston, evaluated the petitioner on November 5, 2007, and similarly issued a certificate finding the petitioner permanently "disabled." After reviewing all of the petitioner's medical records and examining the petitioner, Dr. Eliades concluded that the petitioner's disability "arises from injuries sustained in the motor vehicle accident on February 21, 2004." He further concluded that the subsequent vehicle accident on June 1, 2004, did not contribute to this disability.

¶ 49                                    c. Dr. Gary M. Yarkony

¶ 50        Dr. Gary M. Yarkony, a physician at the Rehabilitation Medicine Specialists Group in Elgin, examined the petitioner on November 12, 2007. He, too, issued a certificate finding the petitioner permanently "disabled." Dr. Yarkony opined that because the petitioner's radicular symptoms began following his initial February 21, 2004 accident, the injuries sustained in that accident were the underlying cause of the petitioner's disability. Dr. Yarkony further found that the second June 1, 2004, accident only exacerbated the initial injury.

¶ 51    5. Physicians Evaluating Petitioner for Purposes of Workers' Compensation Benefits

¶ 52        During the administrative hearings, the Pension Board also introduced copies of depositions of two independent medical evaluators (Dr. Alexander Ghanayem and Dr. Thomas Gleason), who examined the petitioner at the request of the Village for purposes of assessing the viability of the temporary workers' compensation disability benefits that the petitioner was receiving while still employed by the Village.

¶ 53                                    a. Dr. Alexander J. Ghanayem

¶ 54        Dr. Ghanayem examined the petitioner on February 9, 2006, and August 2, 2006. In his deposition, taken on January 14, 2008, Dr. Ghanayem testified that he had no independent recollection of either of these examinations and that he would refrain from providing any opinion as to what caused the petitioner's disability.

¶ 55                                    b. Dr. Thomas F. Gleason

¶ 56        Dr. Thomas Gleason, a physician with the Illinois Bone and Joint Institute, was deposed on June 17, 2008, and testified that he evaluated the petitioner on behalf of the Village's workers' compensation carrier. He issued a report on February 28, 2008, wherein he concluded that the petitioner's February 21, 2004 accident neither caused nor contributed to the petitioner's disability. Dr. Gleason opined that the petitioner's injuries from the February 2004 accident should have taken about eight weeks to improve and that "any further complaints and associated treatment subsequent to June 1, 2004, would not be related to February 21, 2004, but rather to other factors which may include the collision of June 1, 2004, as well as other unidentified incidents thereafter." According to Dr. Gleason, the February 2004 accident only temporarily aggravated an underlying preexisting condition from which the petitioner fully recovered prior to June 1, 2004. He explained that an identifiable injury is not required to "develop a symptomatic low back condition which can cause pain and disability." Accordingly, Dr. Gleason concluded that the February 2004 accident did not "at all" contribute to the petitioner's disability. On cross-examination, Dr. Gleason admitted that in coming to this conclusion, he does not recall reviewing Dr. Cottrell's May 21, 2004, notes.

#### c. Dr. Samuel Chmell

To counter the findings of Dr. Gleason, while seeking temporary workers' compensation disability benefits, in 2008, the petitioner, represented by an attorney, hired his own medical expert, Dr. Samuel Chmell, to provide an independent medical evaluation about his condition. This evaluation was introduced as evidence during the petitioner's pension hearings. After examining the petitioner on July 12, 2008, and on the basis of the medical records of the petitioner's treating physicians, Dr. Chmell concluded that the petitioner was still experiencing lower back pain when he was reinjured in the June 1, 2004, car accident. Dr. Chmell was unable to isolate one accident as the cause of the petitioner's disability but rather concluded that the need for petitioner's surgery was attributable to both car crashes.

#### 6. The Pension Board's Findings

After reviewing all of the evidence presented to it at the administrative hearings, the Pension Board unanimously voted to deny the petitioner's request for a "line-of-duty" disability pension, and instead awarded him a "nonduty" disability pension. In doing so, the Pension Board specifically found that the petitioner's disability was not incurred by or result from the performance of an "act of duty," because: (1) the February 2004 accident did not involve an act that inherently required special risks not ordinarily assumed by regular citizens; and (2) the petitioner's contention that he was exiting the gas station in pursuit of the missing juvenile was contradicted by his CAD sheet. The Pension Board further found that even if the petitioner was injured in the performance of "an act of duty," he was not entitled to a "line-of-duty" pension because his disability was not caused by the February 2004 car accident. The Board specifically found that the petitioner fully recovered from his February 2004 injuries prior to the second, off-duty June 2004 accident, which ultimately resulted in his permanent inability to perform the duties of a police officer.

#### B. The Circuit Court Proceedings

The petitioner appealed the decision of the Pension Board by filing a complaint for administrative review with the circuit court. After a hearing, the circuit court reversed the Pension Board's order and granted the petitioner's "line-of-duty" disability pension. In a written order explaining its findings, the circuit court held that the petitioner was injured while performing an "act of duty" and that his disability was at least in part caused by the injuries he sustained in the February 21, 2004, vehicle crash. The Pension Board now appeals.

#### II. ANALYSIS

On appeal, the Pension Board makes two arguments: (1) that the petitioner's February 21, 2004, injury was not incurred in the performance of an "act of duty," as is required pursuant to section 3-114.1 of the Pension Code (40 ILCS 5/3-114.1 (West 2006)) in order for an applicant to receive a "line-of-duty" disability pension; and (2) that, in either event, even if the injury was incurred while the petitioner was performing an "act of duty," the

February 21, 2004, accident did not contribute to the petitioner's disability but, rather, that the disability resulted from his subsequent off-duty car accident. We will address each of these contentions in turn.

¶ 65                                    A. "Act of Duty"

¶ 66    We begin with the Pension Board's interpretation of an "act of duty." Before addressing the merits of this issue, however, we must first address the applicable standard of review. It is well established that in administrative cases, our role is to review the decision of the administrative agency, and not the determination of the trial court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006) (*per curiam*); see also *Lindsey v. Board of Education*, 354 Ill. App. 3d 971, 978 (2004). Section 3-148 of the Pension Code (40 ILCS 5/3-148 (West 2006)) provides that judicial review of the decision of the Board is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2006); see also *Marconi*, 225 Ill. 2d at 532; see also *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001); *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 537 (1997)). The Administrative Review Law provides that our review extends to all questions of fact and law presented by the entire record. 735 ILCS 5/3-110 (West 2006); see also *Marconi*, 225 Ill. 2d at 532.

¶ 67    "The applicable standard of review–which determines the extent of deference afforded to the administrative agency's decision–depends on whether the question presented is a question of fact, a question of law, or a mixed question of law and fact." *Marconi*, 225 Ill. 2d at 532; see also *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 463 (2009); *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998) ("[t]he standard of review applicable to the agency's decision depends upon whether the question presented is one of fact or law"). An administrative agency's findings on questions of fact are deemed to be *prima facie* true (735 ILCS 5/3-110 (West 2006)), and a reviewing court will reverse the Board's factual determinations only if it concludes that they were contrary to the manifest weight of the evidence. *Illinois Fraternal Order of Police Labor Council v. Illinois Local Labor Relations Board*, 319 Ill. App. 3d 729, 736 (2001) ("[T]he decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident."). The Board's conclusions of law, however, are not entitled to the same deference, and we review them *de novo*. *Illinois Fraternal Order of Police Labor Council*, 319 Ill. App. 3d at 736. If the question presented for review is one of mixed law and fact, then a yet third standard applies, and we review the Board's decision to determine if it was clearly erroneous. *City of Belvidere*, 181 Ill. 2d at 204; see also *Kouzoukas*, 234 Ill. 2d at 463-64; see also *Illinois Fraternal Order of Police Labor Council*, 319 Ill. App. 3d at 736. Under any standard of review, the petitioner to an administrative proceeding bears the burden of proof, and relief will be denied if he fails to sustain that burden. *Marconi*, 225 Ill. 2d at 532-33.

¶ 68    In the present case, the Pension Board contends that our review of whether the petitioner sustained his injuries while performing an "act of duty" should be under a clearly erroneous standard. The petitioner, on the other hand, argues that the applicable standard of review is *de novo* because the definition of an "act of duty" is a matter of statutory construction and therefore presents a purely legal question, which requires no deference to the administrative

agency's findings. We find that as between the two, the clearly erroneous standard is more appropriate.

¶ 69    Although the petitioner may be correct that the interpretation of the statutory term "act of duty" requires *de novo* review, that definition must be applied to and depend upon the sufficiency of facts presented to the Board during the disability hearing. *Filskov v. Board of Trustees of the Northlake Police Pension Fund*, 409 Ill. App. 3d 66, 69, 71 (2011) (noting that whether a police officer has suffered an injury while performing an " 'act of duty' " is "fact specific" and requires an "examination of the legal effect of a given set of facts" (internal quotation marks omitted)). While there appears to be some varying discussion among the appellate courts as to which standard of review applies when the facts in the record with respect to the petitioner's conduct and capacity in sustaining the injury are *undisputed*,[9] where, as here, the record reveals that the administrative agency applied *disputed* facts to the definition of an "act of duty," the standard of review is clearly erroneous. See *City of Belvidere*, 181 Ill. 2d at 205. Under this standard, an agency's decision will not be upheld only where "the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc.*, 198 Ill. 2d at 395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 70    Turning to the merits, we begin by noting that the Illinois Pension Code (40 ILCS 5/1-101 *et seq.* (West 2006)) provides different pension benefits depending upon the circumstances of a police officer's incurred disability. An officer who is physically disabled "as a result of sickness, accident, or injury incurred in or resulting from the performance of an act of duty" is entitled to a "line-of-duty" pension equal to 65% of the salary attached to his or her rank. See 40 ILCS 5/3-114.1 (West 2006). An officer disabled "as a result of any cause other than the performance of an act of duty," on the other hand, is entitled to a disability pension of only 50% of the applicable salary. See 40 ILCS 5/3-114.2 (West 2006).

¶ 71    It is well established that an officer does not qualify for a "line-of-duty" disability pension merely because he was injured while on duty. See *Merlo*, 383 Ill. App. 3d at 100;

---

[9]A majority of courts have held that when the facts are *undisputed*, the interpretation of the term "act of duty" in the Pension Code is an issue of statutory construction to be reviewed *de novo*. See, *e.g.*, *Sarkis v. City of Des Plaines*, 378 Ill. App. 3d 833, 836 (2008); *White v. City of Aurora*, 323 Ill. App. 3d 733, 735 (2001) (where the facts are undisputed, and the Board interpreted the meaning of "act of duty" contained in the statute, the issue was one purely of statutory interpretation); *Fedorski v. Board of Trustees of the Aurora Police Pension Fund*, 375 Ill. App. 3d 371, 373 (2007) (finding the dispute hinged on the determination of "act of duty" and, therefore, *de novo* review applied); *Alm v. Lincolnshire Police Pension Board*, 352 Ill. App. 3d 595, 598 (2004) (*de novo* review applied where the facts were undisputed and the only issue was the meaning of "act of duty"). Several other courts, on the other hand, have found, on what appeared to be undisputed facts, that the issue of whether the police officer was performing an "act of duty" presented a mixed question of fact and law, and therefore the clearly erroneous standard of review applied. See, *e.g.*, *Jones v. Board of Trustees of the Police Pension Fund*, 384 Ill. App. 3d 1064, 1068 (2008); see also *Merlo v. Orland Hills Police Pension Board*, 383 Ill. App. 3d 97, 99-101 (2008).

see also *White v. City of Aurora*, 323 Ill. App. 3d 733, 736 (2001); see also *Jones*, 384 Ill. App. 3d at 1069 ("[s]omething more than being 'on duty' is required to receive a line-of-duty pension"); *Sarkis*, 378 Ill. App. 3d at 837 ("An officer does not perform 'an act of duty' merely by being on duty at the relevant time."). Although article III of the Pension Code, which pertains to police pension funds for cities that have a population of less than 500,000, such as the Village of Mount Prospect in this case, does not explicitly define the term "act of duty," article V of the Pension Code, pertaining to police pension funds in municipalities with populations over 500,000, does. See 40 ILCS 5/5-113 (West 2006). Our supreme court has specifically stated that the "act of duty" definition contained in article V of the Pension Code applies to the use of that term in article III. See *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 540 (1997) ("[w]e may look to article V of the Pension Code for a definition of language used in article III of the Code"); see also *Jones*, 384 Ill. App. 3d at 1069; *Filskov*, 409 Ill. App. 3d at 70 n.1.

¶ 72    Section 5-113 of the Pension Code defines the term "act of duty" as "[a]ny act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life, imposed on a policeman." 40 ILCS 5/5-113 (West 2006). In *Johnson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 114 Ill. 2d 518 (1986), our supreme court for the first time interpreted the definition of an "act of duty," as defined by section 5-113 of the Pension Code, and expressly rejected the notion that the term "special risk" encompasses only inherently dangerous activities. *Johnson*, 114 Ill. 2d at 521; see also *Alm*, 352 Ill. App. 3d at 599.

¶ 73    In *Johnson*, a police officer was at his assigned post when a citizen from across an intersection called to him asking for assistance in a traffic accident. *Johnson*, 114 Ill. 2d at 520. While crossing the intersection, the police officer slipped and injured himself. *Johnson*, 114 Ill. 2d at 520. Our supreme court held that the police officer's actions were an "act of duty" as defined by the Pension Code because when he suffered the injury, the officer was discharging his sworn duties by responding to a citizen's call. *Johnson*, 114 Ill. 2d at 520. In coming to this conclusion, our supreme court specifically rejected the pension board's argument that the officer was not entitled to "line-of-duty" benefits because crossing the road did not involve special risks. *Johnson*, 114 Ill. 2d at 522. As the court noted:

> "The provisions of [the Pension Code] conferring the right to duty-disability benefits do not require that an officer be injured *by* an act of duty. Rather, the duty disability is awarded when an officer is 'disabled *** as the result of injury incurred *** in *the performance of an act of duty*.' (Emphasis added.) [Citation.] In the plaintiff's case, the act of duty was the act of responding to the call of a citizen for assistance. In performing that act, he was injured.
>
> The defendant's interpretation envisions a police officer involved in a gun battle, a high-speed car chase, or some other obviously dangerous situation in order to qualify for duty-disability benefits. This is an overly restrictive and unrealistic interpretation. If this court were to adopt the defendant's narrow reading *** it could discourage police officers from the dedicated and enthusiastic performance of their duties ***." *Johnson*, 114 Ill. 2d at 522-23.

¶ 74     Furthermore, in *Johnson,* our supreme court reiterated that officers discharging their duties to protect citizens perform many tasks, such as driving automobiles, climbing stairs, and even crossing streets, that are similar to those involved in civil occupations. *Johnson*, 114 Ill. 2d at 521-22. The supreme court then held that in determining whether an officer is entitled to a "line-of-duty" pension, "[t]he crux is the capacity in which the police officer is acting." *Johnson*, 114 Ill. 2d at 522. Accordingly, an officer performing duties involving special risks will be entitled to "line-of-duty" benefits even if the immediate cause of injury is an act involving only an ordinary risk. See *Johnson*, 114 Ill. 2d at 522.

¶ 75     Since *Johnson,* in determining whether an officer is entitled to a "line-of-duty" pension, the majority of our appellate courts have focused on the capacity in which the officer was acting at the time of his injury. See, *e.g.*, *Merlo*, 383 Ill. App. 3d at 102; *Jones*, 384 Ill. App. 3d at 1072; *Alm*, 352 Ill. App. 3d at 602; but see, *White*, 323 Ill. App. 3d at 736. Accordingly, our courts have found that an officer was injured in the performance of an "act of duty" when the officer: (1) was involved in a car accident while driving a police transport van on patrol (*Jones*, 384 Ill. App. 3d at 1074); (2) was riding a bicycle on patrol (*Alm*, 352 Ill. App. 3d at 601); (3) fell through a porch while serving a notice to appear (*Wagner v. Board of Trustees of the Police Pension Fund*, 208 Ill. App. 3d 25, 29 (1991)); (4) injured his shoulder while raising a railroad crossing gate (*Sarkis*, 378 Ill. App. 3d at 841); and (5) responded to a civilian call reporting juveniles stacking concrete parking blocks in a parking lot and suffered an injury when he attempted to remove the hazard by unstacking the concrete blocks (*Merlo*, 383 Ill. App. 3d at 98). On the other hand, our courts have found that an officer was not injured in the performance of an "act of duty" where: (1) the officer was injured when he attempted to sit down in a chair at his desk to fill out a police report and the chair rolled out from underneath him (*Morgan v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 172 Ill. App. 3d 273, 276-77 (1988)); (2) the officer was injured while exiting his police vehicle to place a parking citation on an illegally parked car and the police department also employed civilians to issue parking citations (*White*, 323 Ill. App. 3d at 736); (3) an evidence technician was injured when the unmarked police vehicle in which he was riding as a passenger was struck while stopped at a red light (*Fedorski*, 375 Ill. App. 3d at 375); and (4) the officer was injured when attempting to enter the rear seat of an unmarked squad car still in the police station parking lot and admittedly without having yet resumed his patrol duties (*Filskov*, 409 Ill. App. 3d at 72-73).

¶ 76     In the present case, the Pension Board found that the petitioner was not performing an "act of duty" when he was injured in the February 21, 2004, accident because nothing about his investigation of the missing juvenile inherently involved special risks not ordinarily assumed by a citizen in ordinary walks of life. The Board initially disbelieved the petitioner's testimony that at the time of the accident, he was continuing his investigation into the missing juvenile and attempting to turn left onto Rand Road to locate the juvenile. The Board noted that the petitioner never told the dispatch center about the conversation he had with the gas attendant in which he learned that the juvenile had just left the gas station and was walking south east on Rand Road. Rather, the Board pointed out, the petitioner's dispatch records to central command revealed that once he went to the gas station, the petitioner logged in his computer the words "NO JUVS HERE," and then "cleared and closed" the call

at 17:30:01, prior to the accident.

¶ 77    Under these facts, the Board found that at the time of the car accident the petitioner was not involved in an investigation but was merely "driving his squad car," which is an activity that does not involve any special risks. In support of this contention, the Board pointed out that in his own testimony the petitioner stated that "there was no reason given the nature of this case that [he] had to use extraordinary efforts to get out of the gas station in order to pursue the juvenile." In addition, the petitioner admitted that at the time of the accident, he did not have either the lights or the sirens activated on his squad car. For the reasons that follow, we disagree with the findings of the Pension Board.

¶ 78    Although we have some misgivings about the Board's rejection of the petitioner's testimony regarding his continued investigation of the missing juvenile solely on the basis of the petitioner's dispatch records, we recognize that the Board's factual findings, such as its conclusion that the petitioner was not proceeding with his investigation at the time of the car accident, are given great deference and are not to be disturbed unless manifestly erroneous. See *Illinois Fraternal Order of Police Labor Council*, 319 Ill. App. 3d at 736. We need not, however, determine whether this particular finding by the Board was against the manifest weight of the evidence, because we conclude that even if, as the Board found, the petitioner had completed his investigation of the missing juvenile, as he was departing from the gas station in his squad car, he was nevertheless performing patrol duties, which inherently involve special risks not ordinarily assumed by regular citizens in their daily lives.

¶ 79    In that respect, we find the decisions of *Jones*, 384 Ill. App. 3d at 1071-72, and *Alm*, 352 Ill. App. 3d at 602, directly on point. In *Jones*, the police officer was injured when a transport van[10] he was driving on routine patrol was hit by another vehicle. *Jones*, 384 Ill. App. 3d at 1065-66. As a result of the accident, the officer suffered shoulder and back injuries and later underwent back surgery. *Jones*, 384 Ill. App. 3d at 1066. The officer applied for a "line-of-duty" pension, but the pension board rejected his application and instead found that he was entitled only to a "nonduty" disability pension. *Jones*, 384 Ill. App. 3d at 1066. In doing so, the pension board specifically found that "driving a [police] van did not involve a 'special risk' " and therefore did not constitute the performance of an "act of duty." *Jones*, 384 Ill. App. 3d at 1066. The circuit court reversed the decision of the pension board, and the appellate court affirmed. *Jones*, 384 Ill. App. 3d at 1066-67.

¶ 80    The appellate court explicitly rejected the board's conclusion that the officer was not performing an act of duty because he only "encountered the general risks attendant to driving a car and driving the vehicle on routine patrol did not involve a special risk." *Jones*, 384 Ill. App. 3d at 1071. Rather, the court in *Jones* reiterated that the focus of the analysis is on the capacity in which the officer is undertaking the activity by which he is injured, and not on the activity itself. *Jones*, 384 Ill. App. 3d at 1073. Accordingly, the *Jones* court found that "even if driving a car involves only an ordinary risk [the police officer] was [nevertheless] acting in a capacity that involved special risk when he was injured–routine patrol." *Jones*,

---

[10]The *Jones* court noted that it was unclear from the record whether the transport van was a marked police vehicle. *Jones*, 384 Ill. App. 3d at 1065.

-18-

384 Ill. App. 3d at 1073.

¶ 81    In coming to this conclusion, the court in *Jones* analyzed the officer's job description and noted that, among other things, a patrol officer must have his "attention and energies directed toward being prepared to deal with any eventuality," "possess safety-minded driving ability and be conscious of all types of road conditions either in the course of normal patrol or when responding to an emergency call" and "control and regulate vehicular and pedestrian traffic as needed." (Internal quotation marks omitted.) *Jones*, 384 Ill. App. 3d at 1072-73. The court concluded that there were special risks associated with routine patrol, namely "being prepared to respond to *** citizen requests, controlling and regulating traffic, and maintaining constant vigilance," which were not those that would be encountered by ordinary citizens, and that therefore the officer was performing an "act of duty" when he was injured even though the act itself involved merely driving a vehicle. See *Jones*, 384 Ill. App. 3d at 1073.

¶ 82    Similarly, in *Alm*, the appellate court rejected the pension board's finding that a police officer who injured his knee while on bicycle patrol was not entitled to a "line-of-duty" pension because riding a bicycle did not constitute preforming an "act of duty." *Alm*, 352 Ill. App. 3d at 602. The officer in that case was on bicycle patrol when he noticed significant pain in his right knee. *Alm*, 352 Ill. App. 3d at 597. The officer had not fallen or had any other sort of accident prior to experiencing the pain. *Alm*, 352 Ill. App. 3d at 597. After immediately seeking treatment, the officer was diagnosed with a tear in the "medial meniscus of his right knee." *Alm*, 352 Ill. App. 3d at 596. The officer sought a "line-of-duty pension," but the pension board denied his request and held that he had not been injured in the performance of an "act of duty," since the "manner in which [he] was pedaling his bicycle when his knee began to hurt did not involve any special risk not shared by civilians." *Alm*, 352 Ill. App. 3d at 597. The circuit court affirmed the decision of the pension board. *Alm*, 352 Ill. App. 3d at 597.

¶ 83    In reversing the board's decision, the appellate court in *Alm* found that "pedaling the bicycle" constituted "an act of duty," because while on patrol the officer "faced risks not ordinarily encountered by civilians," including, "falls and collisions as well as dangerous encounters with unsavory elements of society." *Alm*, 352 Ill. App. 3d at 601. The court in *Alm* found it insignificant that the bicycling officer was not responding to a call for assistance or facing those specific risks at the exact time he suffered the injury. *Alm*, 352 Ill. App. 3d at 601-02. Rather, just like in *Jones*, the *Alm* court reiterated that in *Johnson*, our supreme court focused the inquiry on the capacity in which the officer was acting at the time of the physical act which caused his injury, and not on the act itself. *Alm*, 352 Ill. App. 3d at 602. The court in *Alm* found that while riding his bicycle the officer was acting in a capacity of patrol officer, a capacity that involved special risks. *Alm*, 352 Ill. App. 3d at 601. In concluding that the bicycle patrol involved special risks, the court in *Alm*, just like the court in *Jones*, focused on the officer's testimony regarding his daily patrol duties and noted that the officer was required to "ride his bicycle at night over varying terrain, looking after his own personal safety while also remaining vigilant in the performance of his patrol duties," and "carrying a significant amount of additional weight [namely, his uniform and weapons]." *Alm*, 352 Ill. App. 3d at 601.

-19-

¶ 84    In the present case, just as in *Jones* and *Alm*, the record reveals that although at the time of the car accident the petitioner performed the act of driving, he performed that act in the capacity of a patrol officer, which involved "special risks" not ordinarily assumed by ordinary citizens, so as to be entitled to a "line-of-duty" pension. The record revels, and it is uncontroverted that on the day of the accident, the petitioner was a patrol officer for the Village of Mount Prospect, with an assigned patrol shift from 3 p.m. to 11 p.m. The petitioner testified, and it was undisputed by the record, that his duties as a patrol officer required that he actively patrol the Village (in his squad car, on his bicycle or on foot) in order to "protect the property and person of the citizens of the Village." The petitioner was required to conduct traffic stops, respond to calls, interview witnesses and suspects, and on occasion to use force to restrain offenders and suspects. In addition, each day, while on patrol duty, the petitioner was required to wear a significant amount of heavy equipment, including, *inter alia*, police boots, a bulletproof vest, loaded weapons, ammunition, handcuffs, a baton and a flashlight. Accordingly, regardless of whether the petitioner was continuing his investigation into the missing juvenile or whether he had completed his response to this particular call, the record reveals that at the time of the accident, the petitioner, who was in full gear inside his marked squad car, was performing his patrol duties, which required special skills not ordinarily encountered by everyday citizens, namely, "hav[ing] his attention and energies directed towards being prepared to deal with any eventuality." *Johnson*, 114 Ill. 2d at 522. For these reasons, we find that he was entitled to a "line-of-duty" pension. See *Alm*, 352 Ill. App. 3d at 602 (relying on our supreme court's decision in *Johnson*, to hold that it was immaterial whether the officer was responding to a call, as long as he was performing his routine patrol duties at the time of the injury; noting that "[w]hether an officer has discretion to perform an act is relevant to determine whether the capacity in which he is acting involves special risk and is, therefore, an act of duty. However, the discretion involved in performing specific physical activities is not relevant because such discretion does not bear upon the capacity in which the officer is acting."); see also *Johnson*, 114 Ill. 2d at 521-22 ("Police officers assigned to duties that involve protection of the public discharge those duties by performing acts which are similar to those involved in many civilian occupations. Driving an automobile, *** walking up stairs, and even crossing the street are activities common to many occupations, be it policeman or plumber. *** The crux[, however,] is the capacity in which the police officer is acting."); see also *Jones*, 384 Ill. App. 3d at 1073 (noting that "[w]hile job title alone is insufficient to establish performance of an act of duty" the officer "was performing the duties of patrol officer at the time of the injury, and those duties involved special risk. As the job description reflects, [the officer] had to, like the officer in *Johnson*, have his 'attention and energies directed toward being prepared to deal with any eventuality.' [Citation.]"); see also *Merlo*, 383 Ill. App. 3d at 102 (finding it insignificant that juveniles, reported for stacking concrete parking blocks in a parking lot, had already left the premises, when the officer arrived at the scene, and that the village public works department was designated the duty of moving back the parking blocks, in determining that officer was performing an "act of duty" when he decided to voluntarily unstack the parking blocks).

¶ 85    In order to circumvent the holdings in *Jones* and *Alm*, the Board relies on the decision

in *White*, 323 Ill. App. 3d at 736. In that case, which was decided prior to both *Jones* and *Alm*, a divided panel of the Second District concluded that an officer on patrol was not entitled to a "line-of duty" disability pension when he slipped while exiting his vehicle to place a parking citation on an illegally parked car. *White*, 323 Ill. App. 3d at 736. The majority in *White* found that the police officer's action of citing a parking ticket amounted to a clerical action, which can be performed by regular citizens in ordinary life, and that therefore the patrol officer was not performing an "act of duty" when he was injured.[11] *White*, 323 Ill. App. 3d at 736.

¶ 86 Since the decision in *White*, however, more than one appellate court has explicitly rejected the holding of the *White* majority, finding that the majority improperly focused on the act performed rather than the capacity in which the officer was acting at the time of the injury, in direct contravention of our supreme court's explicit instructions in *Johnson*, 114 Ill. 2d at 522, that "[t]he crux is the capacity in which the police officer is acting." See, *e.g.*, *Alm*, 352 Ill. App. 3d at 602 ("we believe that the majority in *White* focused on the act performed instead of the capacity in which the officer was acting. The court in *White* focused on the manner in which the officer acted in stopping and exiting his vehicle and the discretion involved in performing these acts. However, we believe that under *Johnson* the proper focus should have been the capacity in which the officer was acting, namely, issuing a parking citation."); *Jones*, 384 Ill. App. 3d at 1072 ("We *** reject the reasoning of *White*. As stated by the supreme court in *Johnson*, the 'crux is the capacity in which the officer was acting.' [Citation.] In *White*, the court improperly focused on the specific act–exiting a car–and not the capacity in which the officer was acting."); *Merlo*, 383 Ill. App. 3d at 102 (rejecting the holding of *White* and noting that the capacity in which the police officer is acting must be examined to determine whether the police officer's injury occurred while he performed an "act of duty"). We agree with the rationale of *Alm*, *Jones*, and *Merlo*, and too reject the holding in *White*. Accordingly, for the aforementioned reasons, we conclude that at the time of the car accident, the petitioner was acting in the capacity of a patrol officer, which required him to undertake special risks not faced by ordinary citizens, and that he was therefore entitled to a full "line-of-duty" disability pension.

¶ 87 In so deciding, we have considered the cases of *Fedorski*, 375 Ill. App. 3d at 372, *Morgan*, 172 Ill. App. 3d at 276-77, and *Filskov*, 409 Ill. App. 3d at 72, cited to by the Pension Board and find them factually distinguishable. Neither *Fedorski* nor *Morgan*

---

[11]It appears that in coming to this conclusion the majority in *White* noted as relevant, although not dispositive, that while the police department required its officers to issue parking tickets, it also employed civilians to issue such tickets, so that the clerical nature of the act was more apparent. *White*, 323 Ill. App. 3d at 736. This reasoning, however, has been explicitly rejected by the subsequent decision in *Merlo*, where the court found that a patrol officer's act in unstacking parking blocks stacked by juvenile delinquents involved special risks even though the village public works department employed civilians to unstack or remove such parking blocks. See *Merlo*, 383 Ill. App. 3d at 102-03 ("The petitioner's duty to protect the public was not eliminated because the village public works department had a duty to remove the stacked parking blocks at some later time.").

involved officers performing *patrol* duties at the time of their injuries. In *Fedorski*, an evidence technician, whose duties that day involved taking photographs of suspects in jail, was injured after an unmarked vehicle that he was driving was struck from behind. *Fedorski*, 375 Ill. App. 3d at 375. Similarly, in *Morgan*, the officer was injured, not while on police patrol, but rather while filling out paperwork inside the police station, when he missed his chair and fell on the floor. *Morgan*, 172 Ill. App. 3d at 276-77.

¶ 88    Similarly, in *Filskov*, a patrol officer, who admitted that he had not yet resumed his patrol duties, was injured as he attempted to enter the backseat of an unmarked squad car in the police station parking lot. *Filskov*, 409 Ill. App. 3d at 72. The officer was injured when another officer in the driver's seat accidentally put the car into gear and ran over the officer's foot. *Filskov*, 409 Ill. App. 3d at 72. In finding that the officer was not injured while performing an "act of duty," the court found relevant that the officer had not yet resumed his patrol duties. *Filskov*, 409 Ill. App. 3d at 72. As discussed in detail above, unlike in *Filskov*, here the record establishes that the petitioner was performing his regular patrol duties when his marked squad car was hit by another vehicle.

¶ 89    For all of the aforementioned reasons, we find the Board's conclusion that the petitioner was not performing an "act of duty" when he incurred the accident to be clearly erroneous. See *Alm*, 352 Ill. App. 3d at 602; *Johnson*, 114 Ill. 2d at 521-22; *Jones*, 384 Ill. App. 3d at 1073; *Merlo*, 383 Ill. App. 3d at 102.

¶ 90                              B. The Cause of the Petitioner's Disability

¶ 91    The Pension Board next argues that its decision to deny the "line-of-duty" disability pension should nevertheless be upheld because the petitioner's disability did not result from his on-duty February 2004 car accident but, rather, solely from his subsequent off-duty June 2004 vehicle collision.

¶ 92    In order to determine whether the Pension Board was correct, we must look to the record to determine the cause of the pensioner's disability. It is well established that "a disability may result from multiple causes," and that in order to obtain a full line-of-duty pension, "[a] claimant need not prove that a duty-related accident is the sole cause, or even the primary cause, of his disability." *Luchesi v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 333 Ill. App. 3d 543, 550 (2002) (citing *Barber v. Board of Trustees of the Village of South Barrington Police Pension Fund*, 256 Ill. App. 3d 814, 818 (1993)); see also *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 505 (2007). Rather, a claimant must only prove that the duty-related accident "is a causative factor contributing to the claimant's disability. " *Luchesi*, 333 Ill. App. 3d at 550 (citing *Hart Carter Co. v. Industrial Comm'n*, 89 Ill. 2d 487, 494 (1982)); see also *Wade*, 226 Ill. 2d at 505 ("a disability pension may be based upon the line-of-duty aggravation of a preexisting physical condition" since " '[t]here is no requirement that the duty- related incident be the originating or primary cause of the injury, although a sufficient nexus between the injury and the performance of the duty must exist' " (quoting *Barber*, 256 Ill. App. 3d at 818)); *Wilfert v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 263 Ill. App. 3d 539, 543 (1994) ("plaintiff need not prove that an injury received on duty was the sole cause of his disability; the injury need only

-22-

have contributed to the disability"); *Alm*, 352 Ill. App. 3d at 598 ("The performance of an act of duty need not be the sole cause of the disability, because *** 'section 3-114.1 does not bar the award of a line-of-duty disability pension based upon the aggravation of a preexisting physical condition.' " (quoting *Olson v. City of Wheaton Police Pension Board*, 153 Ill. App. 3d 595, 598 (1987))).

¶ 93    Before deciding the merits of this issue, we first address the standard of review. The Board contends that factual findings of an administrative agency are *prima facie* true and are to be reviewed under the deferential manifest weight of the evidence standard. The petitioner, on the other hand, contends that the standard of review should be clearly erroneous because the question of legal causation requires an interpretation of the Pension Code and the application of the appropriate facts to that interpretation.

¶ 94    Contrary to the petitioner's position, there is no legal dispute here, as the parties agree that the petitioner is permanently disabled and can no longer perform the duties of a police officer. In addition, there is no dispute as to the definition of causation, as the parties agree that the petitioner need not "prove that a duty-related accident is the sole cause, or even the primary cause, of his disability," but merely that he must show that the duty-related accident was "a causative factor contributing" to that disability. *Luchesi*, 333 Ill. App. 3d at 550; see also *Wade*, 226 Ill. 2d at 505. Therefore, the only question that is presented here is whether the first, on-duty February 2004 accident contributed to the petitioner's disability, or whether the petitioner fully recovered from the injuries sustained in that car accident, so that the second, off-duty June 2004 accident constituted the sole cause of his disability. This is a purely factual determination which we review under a manifest weight of the evidence standard. See, *e.g.*, *Wade*, 226 Ill. 2d at 504-05; see also *Marconi*, 225 Ill. 2d at 534.

¶ 95    Under this standard, an agency's findings are generally afforded great deference and will be found to be against the manifest weight of the evidence "only if the opposite conclusion is clearly evident." (Internal quotation marks omitted.) *Marconi*, 225 Ill. 2d at 534. The "mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

¶ 96    However, we emphasize that the deference accorded to the administrative agency's decision is not without limitation. See *Wade*, 226 Ill. 2d at 507 ("[e]ven under the manifest weight standard *** the deference we afford the administrative agency's decision is not boundless"). "Although it is true that the Board's credibility determinations [are to be] afforded considerable weight, they are not immune from review." *Kouzoukas*, 234 Ill. 2d at 465; see also *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 210-12 (2006) ("our review cannot amount to a rubber stamp of the proceedings below merely because the Board heard witnesses, reviewed records, and made the requisite findings"). Rather, a reviewing court may put aside any findings that are clearly against the manifest weight of the evidence. *Kouzoukas*, 234 Ill. 2d at 465. See also *Bowlin*, 368 Ill. App. 3d at 211-12 ("Even when the decision is supported by some evidence, which if undisputed would sustain the administrative finding, it is not sufficient *if upon a consideration of all the evidence* the finding is against the manifest weight. [Citation.] A reviewing court will not hesitate to grant relief where the record does not show evidentiary

support for the agency's determination. [Citation.]" (Emphasis added.)).

¶ 97    In the present case, the Pension Board found that the petitioner fully recovered from his initial on-duty February 2004 accident before he incurred injuries in the second, off-duty June 2004 collision. For the reasons that follow, we find this conclusion to be against the manifest weight of the evidence.

¶ 98    There is nothing in the record, aside from Dr. Gleason's opinion, that could support the Pension Board's conclusion that the petitioner fully recovered from the injuries he sustained during his on-duty February 2004 car accident, so as to exclude this accident as a contributing factor of his permanent disability. In fact, eight out of nine physicians who were asked to offer opinions as to the cause of the petitioner's disability, including all three of the Board's own independent medical evaluators, concluded that the February 21, 2004, automobile accident at least in part contributed to the petitioner's disability.

¶ 99    Three of the petitioner's treating physicians (Dr. Jacker, Dr. Lannoff, and Dr. Levin) and one of the Board's own medical evaluators (Dr. Shapiro) specifically found that prior to either car accident the petitioner suffered from a preexisting degenerative disc disease at levels L3 and L4. These physicians found that the petitioner's permanent disability (*i.e.*, the herniated and bulging discs and the nerve impingement) resulted from a traumatic injury, which exacerbated the petitioner's preexisting condition. None of the remaining physicians who were asked to give an opinion as to the cause of the petitioner's disability negated or disagreed with this conclusion. In fact, the only disagreement among these eight physicians appears to have revolved around whether (and if so, to what extent) the second accident exacerbated either the injury suffered by the petitioner during his initial car accident or the petitioner's preexisting degenerative disc condition.

¶ 100   The Pension Board nevertheless found that the petitioner's on-duty February 2004 accident did not contribute "at all" to the petitioner's permanent disability. In doing so, the Pension Board seems to have relied upon the opinions of Dr. Gleason and Dr. Levin, as well as the fact that petitioner never told any of his treating physicians about his June 2004 off-duty accident. However, the Pension Board's finding fails to take into account that, when informed of the second accident, none of the eight physicians, excluding Dr. Gleason, dismissed the first accident as a contributing factor to the petitioner's disability.

¶ 101   In fact, four physicians conclusively opined that it was the first, February 2004 on-duty accident that caused the petitioner's permanent injury, *i.e.*, his herniated discs, while the second, June 2004 accident merely exacerbated the petitioner's symptoms. Dr. Jacker, the first orthopedic physician to treat the petitioner after his family physician, specifically testified that although at the time of his diagnosis he was unaware of the petitioner's second accident, after being informed of this accident, his opinion that the petitioner's underlying condition was caused by the first accident, which exacerbated the petitioner's preexisting condition, did not change. Two of the Board's own independent medical examiners, Dr. Shapiro and Dr. Yarkony, agreed with this conclusion. After noting that the petitioner suffered from a preexisting degenerative disc disease, "since the lack of hydration would not have occurred at the time of injury," Dr. Shapiro specifically found that the February 2004 on-duty accident caused the disc herniating and impingement of the existing nerve roots,

while the June 2004 off-duty accident "most likely reaggravated the degenerative disc disease pain from the original accident." Dr. Yarkony similarly opined that the petitioner's disability was caused by the first accident, while the second one merely exacerbated the initial injury. Dr. Eliades, the Board's third independent medical evaluator, even went so far as to find that the June 2004 accident played no part in the petitioner's permanent disability.

¶ 102    The remaining four physicians merely refrained from determining which accident, if any, caused the petitioner's disability. Dr. Lannoff, the physician responsible for administering the petitioner's epidurals, specifically testified that in light of the petitioner's preexisting degenerative disc disease, he could not state which, if either, accident caused the petitioner's disability. Similarly, both Dr. Ghanayem and Dr. Chmell, who evaluated the petitioner for purposes of his workers' compensation benefits, refrained from offering an opinion as to the cause of the petitioner's disability. Dr. Chmell specifically stated that the disability could be "attributable to both accidents," because the petitioner was still experiencing lower back pain when he was reinjured in June 2004.

¶ 103    Finally, although the Pension Board is correct that Dr. Levin, the orthopedic surgeon who performed the petitioner's back surgery, testified that after being informed of the petitioner's June 2004 accident, it was his opinion that the June 2004 accident was "more likely" the cause of the petitioner's disability, he also stated that he could not rule out the first accident as a contributory cause of that disability. Dr. Levin specifically testified that it would be "unrealistic" to believe that the first February 21, 2004, accident did not play a role in the petitioner's herniated discs and that both accidents were "contributory" to the petitioner's disability. In addition, when asked to state whether he believed that the petitioner fully recovered from the February 2004 accident prior to his second June 2004 vehicle collision, Dr. Levin could not give a conclusive opinion either way. Rather, Dr. Levin only testified that depending upon how the medical records between February and June 2004 were interpreted, the petitioner could be perceived as "anywhere from somewhat better, to completely better, or maybe better, maybe not better."

¶ 104    Despite the opinion of these eight physicians, six of whom physically examined the petitioner (Dr. Levin, Dr. Jacker, Dr. Shapiro, Dr. Eliades, Dr. Yarkony, and Dr. Chmell), the Pension Board nevertheless concluded that the petitioner fully recovered prior to his second, June 2004 accident. In coming to this conclusion, the Pension Board relied upon the sole opinion of Dr. Gleason, a physician appointed by the Village's workers' compensation carrier to evaluate the petitioner for purposes of workers' compensation benefits. Dr. Gleason was the only physician who concluded that the petitioner's disability was exclusively caused by the latter automobile accident. Dr. Gleason specifically found that the petitioner's injuries from the February 2004 accident should have taken about eight weeks to improve and that "any further complaints and associated treatment subsequent to June 1, 2004, would not be related to the February 21, 2004, [accident], but rather to other factors, which may include the collision of June 1, 2004." Dr. Gleason opined that the February 2004 accident only temporarily aggravated the petitioner's underlying preexisting condition, from which the petitioner fully recovered prior to June 2004. He further testified that an identifiable injury is not required "develop a symptomatic low back condition which can cause pain and disability."

¶ 105    Dr. Gleason's opinion, however, unlike the opinions of the eight other physicians, was not based upon a physical exam of the petitioner, but rather merely upon a review of the petitioner's medical records. Moreover, Dr. Gleason's opinion as to the petitioner's full recovery from symptoms associated with his initial February 2004 accident was directly contradicted by the notes of the petitioner's family physician, Dr. Cottrell. When questioned about the inconsistences between his opinion and Dr. Gleason's medical records, Dr. Gleason admitted on cross-examination that he did not review Dr. Cottrell's May 21, 2004, notes. Dr. Cottrell's notes reveal that subsequent to the petitioner's first, on-duty February 2004 accident, despite treatment attempts with physical therapy and medication, the petitioner continued to experience pain, which fluctuated on a daily basis. Although some of the records from Dr. Cottrell indicate that petitioner was improving and was permitted to return to work off and on, nothing in the record indicates that his pain completely subsided or that his injury was completely cured prior to the moment when he suffered the second injury. In fact, Dr. Cottrell's notes for May 21, 2004, indicate that during his examination, the petitioner reported persistent back pain of "3/10" and occasionally "6/10," causing Dr. Cottrell to restart the petitioner on an anti-inflammatory and muscle relaxant. Dr. Cottrell also ordered an X-ray of the petitioner's lumbar spine and requested that petitioner return for a follow-up evaluation two weeks later, a date that turned out to be after the second, off-duty accident. In addition, Dr. Cottrell's notes reveal that *prior* to the second accident, he recommended that petitioner make an appointment with Dr. Jacker. The petitioner testified that he made the appointment with Dr. Jacker prior to his June 1, 2004, accident, and there is nothing in the record which contradicts that statement.

¶ 106    Under the aforementioned facts, we find the Pension Board's conclusion that the petitioner fully recovered from his February 2004 accident, so that the injuries he sustained in that accident played no part whatsoever in his ultimate disability, to be contrary to the manifest weight of the evidence. See *Kouzoukas*, 234 Ill. 2d at 464; *Wade*, 226 Ill. 2d at 507; see also *Bowlin*, 368 Ill. App. 3d at 211-12 ("Even when the decision is supported by some evidence, which if undisputed would sustain the administrative finding, it is not sufficient *if upon a consideration of all the evidence* the finding is against the manifest weight. [Citation.] A reviewing court will not hesitate to grant relief where the record does not show evidentiary support for the agency's determination. [Citation.]" (Emphasis added.)).

¶ 107                                    III. CONCLUSION
¶ 108    For all of the aforementioned reasons, we find that the petitioner is entitled to a full "line-of-duty" disability pension. We, therefore, affirm the circuit court's reversal of the Pension Board's decision.

¶ 109    Affirmed.